UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DICE CORPORATION,

        Plaintiff,

                                    Case Number 11-13578

v.                                     Honorable Thomas L. Ludington

BOLD TECHNOLOGIES,

        Defendant.

_____/

**OPINION AND ORDER DENYING
PLAINTIFF'S MOTION FOR RECONSIDERATION**

In this intellectual property dispute, Plaintiff Dice Corporation alleged that Defendant Bold Technology accessed Plaintiff's servers and stole its software. Defendant denied that it did any such thing. Relying on deposition testimony, affidavits, and other evidence showing that it did not access Plaintiff's servers or software, Defendant moved for summary judgment. Plaintiff opposed the motion with conclusory assertions, not evidence. Defendant's motion was granted. *Dice Corp. v. Bold Techs.*, --- F. Supp. 2d ----, 2012 WL 5292920 (E.D. Mich. Oct. 25, 2012).

Plaintiff moves for reconsideration of that decision on two grounds. First, Plaintiff asserts, the court improperly credited the affidavits of one of Defendant's computer programmer, which was "clearly at odds with his deposition testimony." Pl.'s Mot. for Reconsideration ¶ 3, ECF No. 95. And second, new evidence — a copy of "the entire extraction program" — was improperly withheld by Defendant until after Plaintiff filed its motion for summary judgment. *Id.* ¶¶ 6–9. And this evidence demonstrates that "Defendant's program was dependent on Dice source code." *Id.* ¶ 7.

Plaintiff's assertions lack merit. Briefly, the affidavits of the computer programmer are not "at odds with his deposition testimony." They are consistent with the gentleman's testimony, elaborating on subjects that were not fully developed in the deposition. And the evidence proffered is not new. More than a month before Plaintiff filed its motion for summary judgment, a copy of the entire extraction program was produced by Defendant. Plaintiff's factual inaccuracy on this point is troubling. More troubling, however, is Plaintiff's mischaracterization of the evidence itself. The document that Plaintiff relies on in its motion for reconsideration is not a new copy — it is the same copy of the of the entire extraction program, but with Defendant's expert's notes interlineated. And Plaintiff knew this before filing the motion; it was made plain in the expert's deposition. Although the Court chooses not to impose sanctions at this time, it cautions Plaintiff's counsel that such mischaracterizations will not be condoned.

Plaintiff's motion will be denied.

# I

## A

Plaintiff is a Michigan corporation with its principal place of business in Bay City, Michigan. Second Am. Compl. ¶ 1. It was founded in 1992 by Mr. Clifford Dice, who is its president, chief executive officer, and sole owner. Dice Dep. 7, Feb. 29, 2012, *attached as* Def.'s Mot. for Summ. J. Ex. A. Defendant is an Illinois corporation with its principal place of business in Colorado Springs, Colorado. *Id*. ¶ 2.

Competitors, Plaintiff and Defendant both provide software for companies in the alarm industry. Dice Dep. 8, 13; Coles Aff. ¶ 3, *attached as* Def.'s Mot. Ex. B. Specifically, Plaintiff and Defendant license software enabling alarm companies to monitor their customers' alarms. Customers pay the alarm companies to monitor various types of alarms (such as burglar and fire

alarms). Coles Aff. ¶ 3; *see* Dice Aff. ¶ 4, *attached as* Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. A.

To operate their businesses, the alarm companies must collect large amounts of data regarding their customers, including "names, addresses, contact information, billing information, [and] information regarding the type and location of alarms." Coles Aff. ¶ 3. The data is compiled in databases within software that the alarm companies license from companies like Plaintiff and Defendant. *Id*.

On a basic level, Plaintiff's and Defendant's software thus performs the same functions: compiling information and monitoring signals for the alarm companies. Coles Aff. ¶ 3. On a technical level, however, the software is much different. Plaintiff's software operates on a Linux platform and is written in the Thoroughbred Basic computer language. Narowski Aff. ¶ 5, *attached as* Def.'s Mot. Ex. D. Defendant's software operates on a Windows platform and is written in the Microsoft computer languages C++ and Visual Basic. *Id*. Plaintiff licenses its software simply as "Dice software"; Defendant licenses its software under the trade name "Manitou." Coles Aff. ¶¶ 2–3.

**B**

One alarm company, ESC Central, was Plaintiff's customer for a decade; it is now one of Defendant's customers. *See* Jennings (formerly Harris) Dep. 13, *attached as* Def.'s Mot. Ex. F. The present litigation arises out of this change.

ESC Central began licensing Dice software in 2001. *See* Jennings Dep. 10, *attached as* Def.'s Mot. Ex. F. In April 2011, ESC Central signed a software licensing agreement with Defendant. Jennings Dep. 38. Defendant then began converting ESC Central from Plaintiff's software system to Defendant's system.

## C

"Generally speaking," Defendant's chief of operations explains, "the process of converting a customer from one software system to another must be done carefully. Because the customer is actively monitoring alarm signals from thousands of subscribers, the transition from one software to another must be done seamlessly." Coles Aff. ¶ 5. He notes that the transition can take several months, elaborating:

> After the customer signs a license agreement for the new software, one of the first steps in the conversion process is the conversion of the customer's data regarding their subscribers from databases in the old software to databases in the new software. After the customer data is extracted and converted, there will be a period of time, usually about three months, when a customer's central station is running live on the old software, but the new software is running in parallel on different servers. The purpose of running the two software systems in parallel is to ensure that the new software is monitoring the alarm signals consistent with the old software. After this period is completed the customer will go live on the new software and will often terminate its license for the old software.

*Id.* ¶ 6; *see also* Dice Dep. 72 (noting that Plaintiff moves customers onto its system by having the two systems run parallel for a time).

ESC Central, for example, provides services to about 400 dealers and 50,000 customers. Jennings Dep. 7. To transition ESC Central from Plaintiff's system to Defendant's system without interrupting operations of ESC Central's clients, Defendant first extracted ESC Central customer data from Plaintiff's software databases. *See* Coles Aff. ¶ 6 (quoted above); Narowski Aff. ¶ 4. Specifically, Defendant extracted ESC Central's customer "names, addresses, contact information, billing information, information regarding the type and location of alarms." Coles Aff. 4; *see* Dice Dep. 24, 147 (acknowledging that this information is owned by the customer, not Plaintiff).

**D**

Matt Narowski, a computer programmer employed by Defendant, wrote the program to extract this data from Plaintiff's software (which runs on a Linux platform and is written in Thoroughbred basic) and convert it into a format that can be read by Defendant's software (which operates on Windows platform and is written in C++ and Visual Basic). Narowski Aff. ¶¶ 4–7. He explains:

> The function of the Extraction Program is to extract the customer data from databases stored on the Linux operating platform used by Dice software. The customer data is extracted in a comma-separated text file, which is a format that Bold uses to convert the customer data into Manitou, which is the trade name of Bold software. It is my understanding that the extraction program is run after the customer has decided to replace its Dice software with Bold's software and the customer wants to extract its data from the databases where it is stored. There are several other programs available which could extract the customer data from the databases, such as Thoroughbred Query, which is a Thoroughbred product, and products available through Linux. The Extraction Program that I wrote differs from these methods because it converts the customer data into the comma-separated text file format which is more easily utilized for conversion into Bold's Manitou software.
>
> The Extraction Program is not capable of operating an alarm company central station or of monitoring or processing an alarm signal, which is my general understanding of the function of the Dice software.

*Id.* ¶¶ 7–8. Discussing how he created the program, Mr. Narowski continues:

> I wrote the Extraction Program using information available to the public regarding Thoroughbred Basic together with my general knowledge of computer programming. I did not read, review, copy, or rely upon any information about Dice source code or Dice object code when I wrote the Extraction Program, and the Extraction Program does not contain any Dice source code or object code. In fact, since I have been employed at Bold I have not seen a copy of Dice source code or Dice object code.

*Id.* ¶ 6. He emphasizes:

> The Extraction Program does not read or copy any source code, object code or signal processing software of Dice and is not capable of doing so.

> The Extraction Program does not circumvent any security feature built into the Dice software. Dice has security features built into portions of its software which prevent unauthorized users from running those protected portions of the software. However, the database files where the customer data is stored are not subject to any Dice security features and can be accessed by anyone who has a copy of Thoroughbred basic, which Bold licensed from that company.

*Id*. ¶¶ 9–10. In Mr. Narowski's deposition, he was also asked about two other another alarm companies, Sonitrol and Superior, which had also transferred their business from Plaintiff to Defendant. *See* Narowski Dep. 49–50, May 23, 2012, *attached as* Pl.'s Resp. Ex. C. Counsel asked:

> Q: And do you recall what form that data [conversion] took in Sonitrol matter?
>
> A: I don't recall. . . .
>
> Q: Showing you what has been marked as Exhibit 22, which is Bold document 3334.
>
> A: Huh. I did not re-collect — or recollect, sorry.
>
> Q: Is this another way to obtain information?
>
> A: It appears that [Superior] sent us an external hard drive with data on it. . . .
>
> Q: This Dice data would have included Dice programs?
>
> A: I can't recollect, but I would assume.
>
> Q: Dice data would include Dice drivers?
>
> A: That, I don't know.
>
> Q: But whatever was on this hard drive?
>
> A: We would have copied off.

*Id*. Mr. Narowski later elaborated:

> During my deposition I was shown an email regarding a customer known as "Superior" which was marked as Exhibit 22. In the email I reference the fact that I received from Superior a hard drive that contained 14GB of "Dice Data." The

> "Dice Data" that I was referring to was data that was owned by Superior regarding its subscribers that was stored in the databases that were on the hard drive I received for the purpose of converting the customer data from Dice software into Bold. As I indicated in my deposition, I do not know exactly what was included on the hard drive that Superior sent me. My concern was that the hard drive contain all of the customer data that Superior needed converted. The subject line of the email reads "Superior Data" to reference who owned the data. I used the term "Dice Data" in the text of the email to describe the location of the customer data that was being converted from the old software to the new software.
>
> . . .
>
> As I explained in my original affidavit, the Bold extraction program does not circumvent any security features built into Dice software as it accesses databases in the Dice software . . . . During the conversion process Bold does not utilize any source code nor does it run any of the Dice software programs, such as the Dice receiver driver programs.

Narrowski Supp. Aff. ¶¶ 3, 7, *attached as* Def.'s Reply in Supp. Mot. for Summ. J. Ex. Z.

### E

ESC Central's conversion from Plaintiff's software to Defendant's was completed in August 2011. Jennings Dep. 10. On August 5, ESC Central's operations manager, Kristi Jennings, posted a picture of herself on Facebook holding two disconnected Dice cables. Plaintiff's director of software development, Julie Coppens, was one of Ms. Jennings Facebook friends and saw the picture. Coppens Dep. 27, *attached as* Def.'s Mot. Ex. O. In her deposition, she was asked:

> Q: Okay. So what did you do when you saw the picture?
>
> A: I decided I needed to find out what was going on with our software.
>
> Q: And so how did you go about doing that?
>
> A: I went into the office and logged onto our — her system.
>
> Q: Whose system?
>
> A: ESC's system.

Coppens Dep. 27. Inquiring into what Ms. Coppens found after logging into ESC Central's system, counsel asked:

> Q: Okay. And what happened next?
>
> A: I logged into Dice and checked some files and then I went to see what queries were ran.
>
> Q: Okay. And what did you find?
>
> A: It appeared that queries were ran in July that could have been used to convert off of Dice.
>
> Q: To convert what?
>
> A: Data off Dice.
>
> Q: You mean the customer data?
>
> A: Yes. . . .
>
> Q: So these queries led you to believe that ESC wanted to take its data off of the Dice software and move it to a different software, right?
>
> A: Uh-huh.
>
> Q: Is that a yes?
>
> A: Yes.
>
> Q: That is what you suspected was going on?
>
> A: Yes.
>
> Q: Does the customer have the right to do that?
>
> A: Sure.

Coppens Dep. 29–30. About ten days after Ms. Jennings posted the pictures on Facebook, Plaintiff brought suit in this Court.

**F**

On August 16, 2011, Plaintiff filed a complaint against Defendant asserting claims for violations of Michigan's Uniform Trade Secrets Act, conversion, and unjust enrichment. In October, Plaintiff filed its first amended complaint, adding claims for violations of the Computer Fraud and Abuse Act, the Digital Millennium Copyright Act, and copyright infringement.

In November 2011, the Court entered a stipulated order dismissing the conversion and unjust enrichment claims and permitting Plaintiff to file a second amended complaint to revise its Computer Fraud and Abuse Act claim. ECF No. 19. Plaintiff did so.

Defendant then filed a motion to dismiss the Computer Fraud and Abuse Act claim; the motion was denied. *Dice Corp. v. Bold Techs.*, 11-13578, 2012 WL 263031, at *1 (E.D. Mich. Jan. 30, 2012) (observing that the case "presents a somewhat unusual question of statutory interpretation: Is an 'and' disjunctive?" and answering the question in the affirmative).

Later, Defendant moved for summary judgment; that motion, as noted, was granted. *Dice Corp. v. Bold Techs.*, --- F. Supp. 2d ----, 2012 WL 5292920, at *1 (E.D. Mich. Oct. 25, 2012) (observing that while Defendant supported its motion with "deposition testimony, affidavits, and other evidence," Plaintiff opposed the motion with only "conclusory assertions, not evidence").

Plaintiff moves for reconsideration of that decision.

**II**

A motion for reconsideration will be granted if the moving party shows: "(1) a 'palpable defect,' (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733–34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). A "palpable

defect" is "obvious, clear, unmistakable, manifest, or plain." *Michalec*, 181 F. Supp. 2d at 734 (citing *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 262, 278 (E.D. Mich. 1997)). "Motions for rehearing or reconsideration which merely present the same issues ruled upon by the Court, either expressly or by reasonable implication, shall not be granted." *Michalec*, 181 F. Supp. 2d at 734 (brackets omitted) (quoting E.D. Mich. LR 7.1(h)(3))..

### III

Plaintiff, as noted, moves for reconsideration on two grounds. Each is addressed in turn.

### A

#### 1

First, Plaintiff asserts that the Court improperly credited Mr. Narowski's affidavits. Pl.'s Mot. for Reconsideration ¶¶ 3–4. Plaintiff writes: "Narowski's averments in an attorney-prepared affidavit that he neither accessed nor used Dice source code is clearly at odds with his deposition testimony in which he admitted requiring customers to provide him with such confidential information." *Id.* ¶ 3 (emphasis omitted).

Plaintiff's motion does not identify where in Mr. Narowski's deposition he testified that he "used Dice source code" or "admitted requiring customers to provide him with such confidential information." The motion does, however, attach three pages of Mr. Narowski's deposition: pages 30, 31, and 50. Pl.'s Mot. Ex. B.

Yet a review of those pages (as well as the remainder of the gentleman's deposition) shows Plaintiff's assertion lacks a factual foundation — in his deposition Mr. Narowski never said that he used Dice source code or required customers to provide him with such information. And in his affidavit he made plain that he did no such thing.

Taking the three pages one by one, on page 30 of the deposition Plaintiff's counsel asked Mr. Narowski what Defendant's of the phrases "source cut" and "source data" meant. *See* Narowski Dep. 30. Mr. Narowski explained that both phrases meant "the customer data." *Id*. Specifically, Plaintiff's counsel asked:

> Q: [S]ource data. Is that something different than a source cut?
>
> A: That would be the customer data.
>
> Q: Which, according to your sworn testimony, is the same thing that [Defendant's] personnel mean when they use the phrase "source cut"?
>
> A: When we use the phrase "source cut," we are talking about customer data.
>
> Q: And when you use "source data," you are saying the same thing?
>
> A: Saying the same thing.

*Id*. Thus, Mr. Narowski did not testify that he "used Dice source code." The opposite, in fact. He testified that he used the customer data.

He elaborated on this in his affidavit, explaining: "I did not read, review, copy, or rely upon any information about Dice source code or Dice object code when I wrote the Extraction Program, and the Extraction Program does not contain any Dice source code or object code." Narowski Aff. ¶ 6. He emphasized: "The function of the Extraction Program is to extract the *customer data* from databases stored on the Linux operating platform used by Dice software." *Id*. ¶ 7 (emphasis added). His affidavit is wholly consistent with his deposition testimony on page 30.

Plaintiff's reliance on page 31 of the deposition is likewise misplaced. There, Plaintiff's counsel asked:

> Q: And what is it about this particular [Dice conversion] machine that makes it appropriate for converting source data from former Dice customers?

-11-

> A: It allows me to run the script.
>
> Q: Because it already has the Dice software loaded onto it?
>
> A: No, it allows me to run Thoroughbred.

Narowski Dep. 31. Again Mr. Narowski did not testify that he "used Dice source code." The opposite, in fact. In his affidavit, as noted, he explained:

> The Extraction Program does not circumvent any security feature built into the Dice software. Dice has security features built into portions of its software which prevent unauthorized users from running those protected portions of the software. However, the database files where the customer data is stored are not subject to any Dice security features and can be accessed by anyone who has a copy of Thoroughbred basic, which Bold licensed from that company.

Narowski Aff. ¶ 10. Mr. Narowski's affidavit is wholly consistent with his deposition testimony on page 31.

The third and final page of the deposition that Plaintiff attaches to its motion for reconsideration is page 50, which has been quoted above. During that portion of the deposition, Plaintiff's counsel asked Mr. Narowski about two other alarm companies, Sonitrol and Superior, which had also transferred their business from Plaintiff to Defendant. *See* Narowski Dep. 49–50. Counsel asked:

> Q: And do you recall what form that data [conversion] took in Sonitrol matter?
>
> A: I don't recall. . . .
>
> Q: Showing you what has been marked as Exhibit 22, which is Bold document 3334.
>
> A: Huh. I did not re-collect — or recollect, sorry.
>
> Q: Is this another way to obtain information?
>
> A: It appears that [Superior] sent us an external hard drive with data on it. . . .
>
> Q: This *Dice data* would have included Dice programs?

> A: I can't recollect, but I would assume.
>
> Q: *Dice data* would include Dice drivers?
>
> A: That, I don't know.
>
> Q: But whatever was on this hard drive?
>
> A: We would have copied off.

*Id*. (emphasis added). Mr. Narowski then elaborated in his affidavit:

> During my deposition I was shown an email regarding a customer known as "Superior" which was marked as Exhibit 22. In the email I reference the fact that I received from Superior a hard drive that contained 14GB of "Dice Data." The "Dice Data" that I was referring to was data that was owned by Superior regarding its subscribers that was stored in the databases that were on the hard drive I received for the purpose of converting the customer data from Dice software into Bold. As I indicated in my deposition, I do not know exactly what was included on the hard drive that Superior sent me. My concern was that the hard drive contain all of the customer data that Superior needed converted. The subject line of the email reads "Superior Data" to reference who owned the data. I used the term "Dice Data" in the text of the email to describe the location of the customer data that was being converted from the old software to the new software.
>
> . . .
>
> As I explained in my original affidavit, the Bold extraction program does not circumvent any security features built into Dice software as it accesses databases in the Dice software . . . . During the conversion process Bold does not utilize any source code nor does it run any of the Dice software programs, such as the Dice receiver driver programs.

Narowski Supp. Aff. ¶¶ 3, 7. These elaboration supplement rather than contradict the gentleman's deposition testimony.

In sum, nowhere in Mr. Narowski's deposition does he testify that he "used Dice source code" or "admitted requiring customers to provide him with such confidential information." Pl.'s Mot. ¶ 3. And in his affidavits he plainly states that he did no such thing.

-13-

The Sixth Circuit instructs that nothing prevents "a party who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit. Such an affidavit fills a gap . . . and thus provides the district court with more information, rather than less, at the crucial summary judgment stage." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006).

Plaintiff's argument that Mr. Narowski's affidavits contradict his deposition testimony lacks merit.

**2**

Implicitly acknowledging as much, Plaintiff further asserts that even if it has no admissible evidence to support its claim that Mr. Narowski accessed or used Dice source code, it should nevertheless be permitted to proceed to trial to attempt to impeach Mr. Narowski. *Id*. ¶¶ 4–5. "Mr. Narowski literally ran from the room [during his deposition]," Plaintiff writes, "and, later, started to cry when questioned about his misappropriation of Dice software . . . . It will be fascinating to observe his demeanor at trial." *Id*. ¶ 6.

Contrary to Plaintiff's contention, this case did not turn on Mr. Narowski's credibility. Rather, as previously noted, Defendant supported its motion for summary judgment with "deposition testimony, affidavits, and other evidence" from numerous sources, while Plaintiff opposed the motion with only "conclusory assertions, not evidence." *Dice Corp. v. Bold Technologies*, --- F.Supp.2d ----, 2012 WL 5292920, at *1 (E.D. Mich. Oct. 25, 2012); *see generally* 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2726 (3d ed. 1998) (discussing situations where questions regarding the credibility of affiants or witnesses may preclude summary judgment).

To survive summary judgment the non-movant must offer more than the hope that a fact-finder may question a witness's credibility — "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and emphasis omitted) (quoting Fed. R. Civ. P. 56(e)); *see generally* Wright, supra, § 2726 ("[T]he general rule is that specific facts must be produced in order to put credibility in issue so as to preclude summary judgment. Unsupported allegations that credibility is in issue will not suffice."). Plaintiff did not come forward with such facts in opposing Defendant's motion for summary judgment. And has not done so now.

Plaintiff's first asserted ground for reconsideration lacks merit.

**B**

Similarly without merit is Plaintiff's second asserted ground for reconsideration. Plaintiff writes: "Regardless of whether this Honorable Court reconsiders its Opinion for the reasons set forth above, reconsideration is warranted based upon Defendant's failure to produce the portion of its extraction program attached hereto as Exhibit 'C' until September 26, 2012." Pl.'s Mot. ¶ 6 (emphasis omitted). Plaintiff further asserts: "Receipt of the entire extraction program permitted Plaintiff for the first time to quantify the extent to which Defendant's program was dependent on Dice source code." *Id.* ¶ 7.

In support of its contention, Plaintiff attaches an affidavit produced by Mr. Dice in which he asserts: "Our receipt of this information allowed us to demonstrate the extent to which Bold's extraction program utilized Dice source code in the conversion process." Dice Aff. ¶ 4, *attached as* Pl.'s Mot. Ex. A.[1]

---

[1] Mr. Dice does not, however, explain how this program demonstrates that Defendant used Plaintiff's source code in the conversion process. Instead, he attaches a computer printout to his affidavit that Defendant

-15-

Contrary to Plaintiff's contention, Defendant produced a copy of its extraction program to Plaintiff's counsel on May 14, 2012. *See* Email from David McDaniel to Craig Horn (May 14, 2012, 2:00 pm), *attached as* Def.'s Resp. to Pl.'s Mot. for Reconsideration Ex. 3. The document was bates stamped "BOLD0003356– BOLD0003359." *See id*.

About this time, Defendant retained the services of Dr. William McUmber as an expert witness. Defendant also gave Dr. McUmber a copy of its extraction program. *See* McUmber Dep. 7, Sept. 26, 2012, *attached as* Def.'s Resp. Ex. 8.

On May 23, 2012, Plaintiff deposed Mr. Narowski. At that deposition, Plaintiff's counsel introduced the copy of the extraction program as Exhibit 9, noting that it was "Bold document 3356 through 3359." Narowski Dep. 17. About five weeks passed. Only then, on June 29, 2012, Plaintiff filed its motion for summary judgment. ECF No. 61.

Dr. McUmber, meanwhile, went to work preparing his expert report. As part of his analysis, he interlineated his copy of the extraction program with his own comments. *See* McUmber Dep. 7. He explains that he made the comments on his copy "so I could keep track of what was going on." *Id*. And he marked his comments by preceding them with two forward slash marks ("//"). *Id*.

On September 26, 2012, Dr. McUmber was deposed. At the deposition, Plaintiff's counsel asked Dr. McUmber if he had created "any notes or any sorts of things that you wrote down in connection with your work on this particular matter." McUmber Dep. 7. Dr. McUmber

---

charitably describes as "virtually incomprehensible." Def.'s Resp. to Pl.'s Mot. 14. The Court's own review, in contrast, finds the document completely incomprehensible. *See generally Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F. Supp. 2d 849, 860 (S.D. Tex. 2007) ("The Court is not obligated to sift through incomprehensible pleadings to determine a party's claim."); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs.").

responded by producing his interlineated copy of the extraction program. McUmber Dep. 7. Plaintiff's counsel marked it as exhibit 3, and then asked Dr. McUmber:

> Q: And just so this record makes sense, sir, the document with your notes has now — is the document that now has the sticker that says Deposition Exhibit No. 3 on it?
>
> A: Okay.
>
> Q: Is that correct?
>
> A: Yes.
>
> Q: Okay. And when you say your notes have a double forward slash; for example, it says expected format of file list —
>
> A: Right.
>
> Q. — has two double slashes, that would be something that you added as you were taking a look at the Bold Extraction program?
>
> A: That's correct. Although it looks like on these line three — two and three I missed the slashes, but I don't see it anywhere else.
>
> Q: But presumably, if we took Deposition Exhibit No. 3 and deleted all the items that start with forward slashes we'd be something pretty close to the Bold Extraction program?
>
> A: It would be the Bold Extraction program exactly.

McUmber Dep. 7–8. This is the document that Plaintiff attaches as Exhibit C to its motion for reconsideration. "Indeed," as Defendant pointedly observes, "Exhibit C bears the sticker showing that it was marked as deposition Exhibit 3 at the September 26, 2012 deposition." Def.'s Resp. 12.

A comparison with the document that Defendant produced to Plaintiff on May 14, 2012, moreover, shows that the two documents are identical aside from Dr. McUmber's interlineations.[2]

Plaintiff's mischaracterization that Defendant wrongfully withheld evidence, as noted, is troubling. *See* Pl.'s Mot. ¶ 9 (cautioning against "reward[ing] Defendant for the gamesmanship implicit in [Defendant's] failure to turn over its entire extraction program till after filing a dispositive motion"). Equally troubling is Plaintiff's mischaracterization of the evidence itself. The document that Plaintiff relies on in its motion for reconsideration is not a new, complete copy of the program — it is the same copy of the of the entire extraction program, but with Dr. McUmber's interlineations. Although the Court chooses not to impose sanctions at this time, it cautions Plaintiff's counsel that such mischaracterizations will not be condoned.

## IV

Accordingly, it is **ORDERED** that Plaintiff's motion for reconsideration (ECF No. 95) is **DENIED**.

Dated: March 28, 2013

                                                 s/Thomas L. Ludington  
                                                 THOMAS L. LUDINGTON  
                                                 United States District Judge

---

[2] In passing, the Court also notes that not only is this evidence not new, Plaintiff has not demonstrated how it is material. Mr. Dice, as noted, asserts that the document "allowed us to demonstrate the extent to which Bold's extraction program utilized Dice source code in the conversion process." Dice Aff. ¶ 4. But this conclusion is not accompanied by an explanation actually demonstrating how Defendant copied Plaintiff's source code. Conclusory assertions are not evidence.

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 28, 2013.

s/Tracy A. Jacobs<br>
TRACY A. JACOBS