UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DICE CORPORATION,

     Plaintiff,       Case No. 11-cv-13578

v             Honorable Thomas L. Ludington

BOLD TECHNOLOGIES LTD,

     Defendant.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART RENEWED MOTION FOR ATTORNEY FEES AND COSTS AND DIRECTING SUPPLEMENTAL BRIEFING**

In this intellectual property dispute, Plaintiff Dice Corporation alleged that Defendant Bold Technology accessed Plaintiff's servers and stole its software. Following the completion of discovery, Defendant moved for summary judgment on all claims. The Court concluded that Plaintiff had not presented any evidence of trade secret misappropriation, copyright infringement, or violation of the Computer Fraud and Abuse Act. Accordingly, because Plaintiff had not produced evidence to support any of its claims, Defendant was entitled to summary judgment. Plaintiff then moved for reconsideration, which the Court denied.

Plaintiff appealed this Court's grant of summary judgment to the Sixth Circuit Court of Appeals. The Sixth Circuit affirmed the grant of summary judgment in favor of Defendants *in toto*, reiterating that Plaintiff did not proffer evidence to support any of its claims.

Returning to this Court, Defendants moved for an award of attorney's fees and costs. Defendants contend that they are entitled to attorney's fees and costs pursuant to the Copyright Act, 17 U.S.C. § 505; Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1905; and 28 U.S.C. § 1927. An award of fees and costs is warranted under each of these statutes;

however, not all of the fees and costs requested by Defendant are reasonable.   Accordingly, Defendant's renewed motion for attorney's fees and costs will be granted in part, and the parties will be directed to file supplemental briefs.

## I

Plaintiff is a Michigan corporation with its principal place of business in Bay City, Michigan.   Second Am. Compl. ¶ 1.   It was founded in 1992 by Mr. Clifford Dice, who is its president, chief executive officer, and sole owner.   Dice Dep. 7, Feb. 29, 2012, *attached as* Def.'s Mot. for Summ. J. Ex. A.   Defendant is an Illinois corporation with its principal place of business in Colorado Springs, Colorado.   *Id.* ¶ 2.

Competitors, Plaintiff and Defendant both provide software for companies in the alarm industry.   Dice Dep. 8, 13; Coles Aff. ¶ 3, *attached as* Def.'s Mot. Ex. B.   That is, Plaintiff and Defendant license software enabling alarm companies to monitor their customers' alarms. Customers pay the alarm companies to monitor various types of alarms (such as burglar and fire alarms).   Coles Aff. ¶ 3; *see* Dice Aff. ¶ 4, *attached as* Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. A. The alarms send signals to receivers located at the alarm companies.   Coles Aff. ¶ 3. When an emergency signal is sent, the company contacts the appropriate authorities (such as police or fire departments).   *Id.*   Larger alarm companies have hundreds of thousands of customers.   *Id.* ¶ 4.   Companies like Plaintiff and Defendant create the software that monitors the signals.   *Id.*

To operate their businesses, the alarm companies must also collect large amounts of data regarding their customers, including "names, addresses, contact information, billing information, [and] information regarding the type and location of alarms."   *Id.*   The data is compiled in

databases within software that the alarm companies license from companies like Plaintiff and Defendant. *Id.*

On a basic level, Plaintiff's and Defendant's software thus performs the same functions: compiling information and monitoring signals for the alarm companies. Coles Aff. ¶ 3. On a technical level, however, the software is much different. Plaintiff's software operates on a Linux platform and is written in the Thoroughbred Basic computer language.[1] Narowski Aff. ¶ 5, *attached as* Def.'s Mot. Ex. D. Defendant's software operates on a Windows platform and is written in the Microsoft computer languages C++ and Visual Basic. *Id.* Plaintiff licenses its software simply as "Dice software"; Defendant licenses its software under the trade name "Manitou." Coles Aff. ¶¶ 2–3.

## A

One such alarm company, ESC Central, was one of Plaintiff's customers for a decade; it is now one of Defendant's customers. *See* Jennings (formerly Harris) Dep. 13, *attached as* Def.'s Mot. Ex. F. The present litigation arises out of this transition.

ESC Central provides services to about 400 dealers and 50,000 customers. Jennings Dep. 7. Located in Birmingham, Alabama, it began licensing Dice software in 2001. *Id.* at 6, 10.

ESC Central's operations manager is Kristi Jennings (formerly Harris). During the decade that ESC Central was one of Plaintiff's customers, Ms. Jennings was actively involved in Plaintiff's operations, chairing its "user group," serving on its "chart committee," and even selling software on Plaintiff's behalf.

---

[1] *See generally Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 305 (S.D.N.Y. 2000) (discussing operating systems and computer languages), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

The "user group" received suggested software changes to Plaintiff's software from customers. *Id*. at 12. The group would then meet and vote on which features to incorporate into future editions of Plaintiff's software. *Id*. Ms. Jennings chaired Plaintiff's user group from 2005 through 2010. *Id*. at 11.

Ms. Jennings was also a member of Plaintiff's "chart code committee." *Id*. at 20. The alarms are programed to send signals to receivers located at the alarm companies' offices. Signals include alerts for fire, flood, burglary, and other types of events. The "event codes," however, vary from manufacturer (for example, one manufacturer would code fire as "1" while another would code fire as "3"). *Id*.

Plaintiff's chart code committee compiled this manufacturer information to update Plaintiff's "ALSCHART" file. *Id*. This file, Plaintiff's user manual explains, is a data file containing information regarding "incoming signals from zones and other information about processing." *Dice Knowledge Base Article 3-1.2* (Sept. 12, 2003), *attached as* Def.'s Mot. Ex. G. Discussing the chart committee's responsibility, Ms. Jennings explained in her deposition: "Our task was to chart codes from manufacturers and submit them to Dice." Jennings Dep. 20. She was then asked:

Q: So how would you go about doing that?

A: We would contact the manufacturers and ask them . . . .

Q: So what did Dice do with the chart codes that were submitted by the committee?

A: They would take it and update it inside Dice software.

Q: And where in the Dice software would we go to find this listing of all the codes?

A:  Within their chart codes.

Q:  Where is that?  What is the name of that file?

A:  The ALS[CHART] codes.

Q:  ALS[CHART]?

A:  Yes. . . .

Q:  And just to be clear, they were — these codes were simply the manufacturers' codes that had been assigned by the various manufacturers for these various types of signals, and then these codes were all accumulated within this file called ALS[CHART] which was part of the Dice software?

A:  Yes.

Jennings Dep. 20–22.  *See also Dice Knowledge Base Article* (Sept. 12, 2003).  And Ms. Jennings also sold software on Plaintiff's behalf.  *Id*. at 13.  In her deposition, she was asked:

Q:  Well, to be able to do that, did you have any particular training or knowledge on the software that would allow you to effectively sell the software for Dice?

A:  The best sales tool to me is the fact that I used it every day, and I knew the in's and out's of the software and how it worked.

Q:  Would you consider yourself to be extremely knowledgeable on the Dice software?

A:  Yes.

Q:  So how many times do you think you actually did sales demos for Dice?

A:  I don't know an exact number.  If I was to estimate, I would say at least 20 times.

Jennings Dep. 13–14.

### B

Before the Dice user group meeting in August 2010, Ms. Jennings emailed Plaintiff with concerns.  Def.'s Mot. Ex. H.  "I'm going to tell you that this may be a make or break year for [the Dice user group]," Ms. Jennings wrote, elaborating: "There are several companies not

- 5 -

coming because 'Dice is going to do what they want not what the users want' and 'it's just a waste of time and money.' . . . I am not going to sugar coat all the things that I have heard and I don't want a call telling me how great things are or how many systems are being sold. There are a number of unhappy customers." *Id*. at 2.

Plaintiff's founder and CEO, Mr. Dice, responded via email: "[W]e are not trying to sell anything. We have to [pare] down the number of clients we have and serve due to the larger scale of the product line currently. Once folks see what our direction is and what our development cycles are[,] [i]f they are not pleased with our direction, they should contact the competition and move quickly to another [software provider] as you indicated, [and] I would encourage it." *Id*.

In September 2010, Ms. Jennings again emailed Plaintiff with concerns. Def.'s Mot. Ex. I. Noting that the software had crashed ESC Central's phone system, Ms. Jennings wrote: "We are aware that DICE seems to think that the Altigen flakiness might be fixed by upgrading. However, before doing anything else with this stupid phone system I want assurances in writing from someone at DICE that this will stop these issues." *Id*. at 2.

Mr. Dice responded: "On one hand, I feel responsible for not configuring multiple boxes, but after kicking myself over and over again[,] I am not sure how I would have known that I needed to. Given the fact that you were a beta site, we all know that the expectation is, that we will all learn things and may change the situation. To make things worse, the relationship between you and I has not been good, and getting worse." *Id*. at 1. He concluded: "So I am sorry that you have had the bad experience. And I want you to know that I want to fix it, but you have to trust us and we have to work closely again. Otherwise, I think it's just better if you start backing out of what you have and planning longer term a change to some other automation

- 6 -

system." *Id*. at 2; *but see* Dice Aff. ¶ 9 ("ESC was not asked to terminate its relationship with Dice and did not leave Dice because of quality issues.").

C

In October 2010, Ms. Jennings took up Mr. Dice on his suggestion that she should contact the competition if she was dissatisfied and emailed Defendant. Jennings Dep. 32–33. In Ms. Jennings' deposition, she was asked:

> Q: [Was] this the first contact that you had in terms of moving from Dice over to Bold?
>
> A: Yes.
>
> Q: At this point in time in October 2010, I mean, had you absolutely made up your mind you were leaving or you were just looking around?
>
> A: No, I just started looking.
>
> Q: Did you look at other Dice competitors beside Bold?
>
> A: Yes.

*Id*. Also in October 2010, Mr. Dice disbanded the users group. Id. at 22.

In February 2011, Ms. Jennings reached what she "called my final straw." Jennings Dep. 36. Finding ESC Central's system was crashing each night, she wrote to Defendant: "I am being blasted by complaints from operators, dealers, and anyone else that is having to deal with this system. I can pretty much guarantee that if we call with a problem it involves some aspect of the phone system not working properly. . . . We now have more points of failure than was ever imaginable before! We haven't heard a solution other than reboot it and see if it works better." Def.'s Mot. Ex. J.

Dissatisfied with Plaintiff's response to this problem, in April 2011 ESC Central signed a software licensing agreement with Defendant. Jennings Dep. 38; *but see* Dice Aff. ¶ 9 (asserting ESC Central "did not leave Dice because of quality issues").

## D

Defendant then began converting ESC Central from Plaintiff's software system to Defendant's system. "Generally speaking," Defendant's chief of operations explains, "the process of converting a customer from one software system to another must be done carefully. Because the customer is actively monitoring alarm signals from thousands of subscribers, the transition from one software to another must be done seamlessly." Coles Aff. ¶ 5. He notes that the transition can take several months, elaborating:

> After the customer signs a license agreement for the new software, one of the first steps in the conversion process is the conversion of the customer's data regarding their subscribers from databases in the old software to databases in the new software. After the customer data is extracted and converted, there will be a period of time, usually about three months, when a customer's central station is running live on the old software, but the new software is running in parallel on different servers. The purpose of running the two software systems in parallel is to ensure that the new software is monitoring the alarm signals consistent with the old software. After this period is completed the customer will go live on the new software and will often terminate its license for the old software.

*Id*. ¶ 6; *see also* Dice Dep. 72 (noting that Plaintiff moves customers onto its system by having the two systems run parallel for a time).

To transition ESC Central from Plaintiff's system to Defendant's system without interrupting customer operations, Defendant first extracted ESC Central customer data from Plaintiff's software databases. *See* Coles Aff. ¶ 6 (quoted above); Narowski Aff. ¶ 4. Specifically, Defendant extracted ESC Central's customer "names, addresses, contact information, billing information, information regarding the type and location of alarms." Coles

Aff. 4; *see* Dice Dep. 24, 147 (acknowledging that this information is owned by the customer, not Plaintiff).

Matt Narowski, a computer programmer employed by Defendant, wrote the program to extract this data from Plaintiff's software (written in Thoroughbred basic) and convert it into a format that can be read by Defendant's software (written in C++ and Visual Basic).  Narowski Aff. ¶¶ 4–7.  He explains:

> The function of the Extraction Program is to extract the customer data from databases stored on the Linux operating platform used by Dice software.  The customer data is extracted in a comma-separated text file, which is a format that Bold uses to convert the customer data into Manitou, which is the trade name of Bold software.  It is my understanding that the extraction program is run after the customer has decided to replace its Dice software with Bold's software and the customer wants to extract its data from the databases where it is stored.  There are several other programs available which could extract the customer data from the databases, such as Thoroughbred Query, which is a Thoroughbred product, and products available through Linux.  The Extraction Program that I wrote differs from these methods because it converts the customer data into the comma-separated text file format which is more easily utilized for conversion into Bold's Manitou software.
>
> The Extraction Program is not capable of operating an alarm company central station or of monitoring or processing an alarm signal, which is my general understanding of the function of the Dice software.

*Id*. ¶¶ 7–8.  Discussing how he created the program, Mr. Narowski continues:

> I wrote the Extraction Program using information available to the public regarding Thoroughbred Basic together with my general knowledge of computer programming.  I did not read, review, copy, or rely upon any information about Dice source code or Dice object code when I wrote the Extraction Program, and the Extraction Program does not contain any Dice source code or object code.  In fact, since I have been employed at Bold I have not seen a copy of Dice source code or Dice object code.

*Id*. ¶ 6.[2]  He emphasizes:

---

[2] For those unfamiliar with computer programing, Judge Kaplan explains:

> Computers come down to one basic premise: They operate with a series of on and off switches, using two digits in the binary (base 2) number system—0 (for off) and 1 (for on).  All data and instructions input to or contained in computers therefore must be reduced to . . . 1 and 0. . . .

The Extraction Program does not read or copy any source code, object code or signal processing software of Dice and is not capable of doing so.

The Extraction Program does not circumvent any security feature built into the Dice software. Dice has security features built into portions of its software which prevent unauthorized users from running those protected portions of the software. However, the database files where the customer data is stored are not subject to any Dice security features and can be accessed by anyone who has a copy of Thoroughbred basic, which Bold licensed from that company.

*Id.* ¶¶ 9–10. Mr. Dice acknowledged in his deposition that Plaintiff has offered no evidence, at least no evidence that is admissible,[3] that Defendant has copied Plaintiff's source code. He was asked:

Q: Are you claiming that Bold has actually copied Dice's source code?

A: To some extent, yes.

Q: What source code are you claiming they copied?

A: The copywritten materials.

Q: And what is your proof that they copied your source code?

A: At this point the only proof we have is that they've been converting our customers using our data that was supplied with the system because they took it . . . .

Q: So you've never looked at Bold's code; is that right?

---

Some highly skilled human beings can reduce data and instructions to strings of 1's and 0's and thus program computers to perform complex tasks by inputting commands and data in that form. But it would be inconvenient, inefficient and, for most people, probably impossible to do so. In consequence, computer science has developed programming languages. These languages, like other written languages, employ symbols and syntax to convey meaning. The text of programs written in these languages is referred to as source code. And whether directly or through the medium of another program, the sets of instructions written in programming languages — the source code — ultimately are translated into machine "readable" strings of 1's and 0's, known in the computer world as object code, which typically are executable by the computer.

*Universal City Studios, Inc. v. Reimerdes*, 111 F. Supp. 2d 294, 306 (S.D.N.Y. 2000) (quotation marks, footnotes, and internal alterations omitted), *aff'd sub nom. Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2d Cir. 2001).

[3] In Mr. Dice's deposition, he also references hearsay assertions made by third parties. *See, e.g.*, Dice Dep. 166–68, 172–73.

- 10 -

A:  Absolutely not.

Q:  So you don't know for a fact that Bold copied Dice's source code, right?

A:  No, we don't know that for a fact.

Dice Dep. 166–67; *see id*. at 61 (acknowledging that Plaintiff's assertion that Defendant copied Plaintiff's source code is "an assumption"); *but see* Dice Aff. ¶ 6 ("The program which Bold has created for converting information belonging to Dice customers cannot operate without access to Dice software and the source code contained within that software").  Questioned further, Mr. Dice again acknowledged that he did not know if Defendant used Plaintiff's code:

Q:  [D]o you have any evidence that Bold is using the identical codes that Dice is using?

A:  Not until we go through all of their software and drivers.

Q:  So the answer to that question would be no, you don't?

A:  No, not at this point.

Dice Dep. 173.

Mr. Dice also acknowledged that ESC Central could access database files where customer data is stored and retrieve the data without circumventing any of Plaintiff's security measures.  Dice Dep. 159.  Third-party applications such as Thoroughbred Query allow users to type in commands, or "queries," to retrieve the data.  In Mr. Dice's deposition, he was asked:

Q:  So no administrative password would have been used —

A:  No.

Q:  — for all these queries?

A:  It just required knowledge.

Dice Dep. 159.  And Mr. Dice acknowledged that Plaintiff's software is not encrypted.  In his deposition, he was asked:

> Q:  [D]oes Dice . . . encrypt its software?
>
> A:  We don't have the capacity to encrypt at an object code level.  We can encrypt a source code, but we've had problems with it in the past so we tend not to encrypt anything.

Dice Dep. 28; *see id*. at 81 (acknowledging "We don't have a way of encrypting files").

## E

In Mr. Narowski's deposition, he was also asked about another alarm company, Sonitrol, that has transferred its business from Plaintiff to Defendant.  *See* Narowski Dep. 49–50, May 23, 2012, *attached as* Pl.'s Resp. Ex. C.  Counsel asked:

> Q:  And do you recall what form that data [conversion] took in Sonitrol matter?
>
> A:  I don't recall. . . .
>
> Q:  Showing you what has been marked as Exhibit 22, which is Bold document 3334.
>
> A:  Huh.  I did not re-collect — or recollect, sorry.
>
> Q:  Is this another way to obtain information?
>
> A:  It appears that they sent us an external hard drive with data on it. . . .
>
> Q:  This Dice data would have included Dice programs?
>
> A:  I can't recollect, but I would assume.
>
> Q:  Dice data would include Dice drivers?
>
> A:  That, I don't know.
>
> Q:  But whatever was on this hard drive?
>
> A:  We would have copied off.

*Id*.  Mr. Narowski later elaborated:

The "Dice Data" that I was referring to was data that was owned by [the client] regarding its subscribers that was stored in the databases that were on the hard drive I received for the purpose of converting the customer data from Dice software into Bold. . . .  I do not know exactly what was included on the hard drive that [the customer] sent me.  My concern was that the hard drive contains all of the customer data that [the client] needed converted. . . .

As I explained in my original affidavit, the Bold extraction program does not circumvent any security features built into Dice software as it access databases in the Dice software . . . .  During the conversion process Bold does not utilize any source code nor does it run any of the Dice software programs, such as the Dice receiver driver programs.  Bold has never used Dice software for the purpose of monitoring alarm signals.

Narrowski Supp. Aff. ¶¶ 3, 7, *attached as* Def.'s Reply in Supp. Mot. for Summ. J. Ex. Z.

**F**

On May 27, 2011, Amy Condon left Plaintiff's employment and joined Defendant's firm. Second Am. Compl. ¶ 11.  Over the next two weeks, Plaintiff's second amended complaint alleges, "Ms. Condon accessed Dice servers located in Dice's Bay City facility and accessed file layouts that contained proprietary signal processing intelligence software."  *Id*. ¶ 12.  Ms. Condon flatly denies this.  "Since I terminated my employment at Dice," her affidavit provides, "I have never accessed or attempted to access any server owned by Dice at its Bay City office or any other location."  Condon Aff. ¶ 6, *attached as* Def.'s Mot. Ex. C.

Mr. Dice acknowledges that Plaintiff has no evidence that Ms. Condon accessed Dice servers.  In his deposition, he was asked:

Q:  Are you claiming that Amy Condon hacked into the Dice servers in Bay City Michigan, yes or no?

A:  I don't think she hacked into anything.  I don't — I don't know if she did or not. . . .

Q:  Did any Bold employees hack into Dice servers located in Bay City, Michigan?

A:  I don't know how Bold got our — got all of our intelligence. . . .  It's not a question for me to answer, it's a question for you to answer.  How did Bold get access to those files[?] . . .

Q:  So the answer to the question that I asked you is you don't know if some Bold employees hacked into the Dice servers located in Bay City, Michigan?

A:  I don't know how Bold got the information to be able to do what they've done.  I have no idea.  All I know is that they have it. . . .

Q:  Okay.  I want to know [about] is this sentence [in paragraph twelve of the complaint] claiming that after Ms. Condon left her employment at Dice she somehow hacked into Dice's Bay City servers?

A:  That's what that says . . . .

Q:  All right.  So on what dates did Miss Condon hack into the servers located in Dice's Bay City facility; what dates did that happen?

A:  We don't know.

Q:  Okay.  How did she hack into the system?

A:  We don't know. . . .

Q:  And what are those things that you say prove that Ms. Condon hacked into the system, what are those things?

A:  You can see the query commands and what data she's accessing, which is our data, not client data.

Dice Dep. 35–41.  Probing into this assertion later in the deposition, counsel asked Mr. Dice:

Q:  And what is the actual query command?

A:  It's basically — let's see.  This one is of — our proprietary file that contains our data, ALSCHART.

Q:  ALSCHART?

A:  Yeah.  It's the file that we provide with our software, and —

Q:  So is the — is the customer allowed to access the ALSCHART [file]?

A:  No.

- 14 -

Dice Dep. 129.

Notwithstanding Mr. Dice's assertion, Plaintiff's own director of software development, Julie Coppens, acknowledges that customers were allowed to access the ALSCHART file. Coppens Dep. 19, *attached as* Def.'s Mot. Ex. O.

In her deposition, Ms. Coppens first explained that she was the person who had first discovered that the queries at issue in this case had been run, testifying that in August 2011

> I logged into Dice and checked some files and then I went to see what queries were ran.

Q:  Okay.  And what did you find?

A:  It appeared that queries were ran in July that could have been used to convert off of Dice.

Q:  To convert what?

A:  Data off Dice.

Q:  You mean the customer data?

A:  Yes.

Q:  Now the data that we are talking about, that belongs to the customer, right?

A:  Specific data belongs to the customer.

Q:  Just the data we're talking about that you are talking about being converted, right?

A:  Yes.

Q:  So these queries led you to believe that ESC wanted to take its data off of the Dice software and move it to a different software, right?

A:  Uh-huh.

Q:  Is that a yes?

A:  Yes.

Q:  That's what you suspected was going on?

A:  Yes.

Q:  Does the customer have the right to do that?

A:  Yes.

Coppens Dep. 29.

## G

Ms. Coppens further acknowledged that customers were specifically permitted access to the ALSCHART.   Initially taking a contrary position in her deposition, Ms. Coppens first asserted that customers were prohibited from accessing the ALSCHART file.  Coppens Dep. 18–19.  On further questioning, however, Ms. Coppens revised her response:

Q:  Has it always been the case that Dice hasn't allowed access to the customers to see the chart table?

A:  Yes.

Q:  What's the chart table called, what's the code name for it?

A:  ALSCHART.

Q:  So if you put into Query select start ALSCHART with just a user's normal login, what would come up?

A:  Well, you can't use it in Query . . . .

Q:  So you can't access it through Query, this ALSCHART file?

A:   You cannot see the tables.  You have to know — you have to know the specific field names in the table.

Q:  Give me an example.  What's a specific field name in the table?

A:   When — say I had a database with customer field, let's say I had customer name, address, what type of panel that they were using, I can actually do a lookup on that file and see those field names in there. . . .

Q:  Why allow Query to access it though?

A: To access what?

Q: The ALSCHART table.

A: We — previously we allowed the ability to create a table but you can't query the table anymore.

Q: Wait a minute.  You said previously you allowed the ability to query the table?

A: Uh-huh.

Q: When was that?

A: Before September.  You have to have knowledge of what to query.

Q: So before September of 2011 —

A: Uh-huh.

Q: — okay, you were able to query the chart table, the ALSCHART table?

A: Right.

Q: So what changed in September of 2011?

A: We found that you could query it.

Q: So what you are telling me about today you can't query the ALSCHART table[,] that wasn't true a year ago, right?

A: Right.  A year ago you could type in the ALSCHART and the field names if you knew the field names.

Q: And it would all come up?

A: Absolutely.

Q: It was not protected from the user, right?  If you had the user login you could gain complete access to the [ALSCHART] — ALSCHART table a year ago, right?

A: Yes.

Coppens Dep. 19, 22–23; *but see* Dice Aff. ¶ 8 ("Bold also misleads this Court when it indicates that the information which Dice claims was misappropriated by Bold was readily available to Dice customers.  Although Dice (or former Dice) personnel could access such proprietary information, this information was hidden from customers themselves.").

## H

Ms. Coppens also confirms that an administrative password was not required to run the queries and that Plaintiff has no evidence of unauthorized access.  Coppens Dep. 32, 77.  She was asked:

> Q:  Is there any evidence that . . . Miss Condon after she left her employment at Dice or anyone else on Bold's behalf . . . somehow gain[ed] unauthorized access to Dice's software?
>
> A:  No one changed the code generator, if that's what you are asking.
>
> Q:  I'm —  I'm asking you do you have any information or evidence that either Amy Condon or someone else at Bold Technologies somehow circumvented the Dice code generator protection on its software at any time?
>
> A:  Not to my knowledge.
>
> Q:  At any of [Plaintiff's] meetings or director meetings did anyone else indicate to you that they had learned that either Miss Condon or someone else on behalf of Bold had done something to circumvent this Dice code generator protection?
>
> A:  No.

Coppens Dep. 77–78.

Plaintiff's chief technical officer, the person directly responsible "for maintaining the security of the Dice servers in Bay City," confirms that Plaintiff has no evidence that any of Defendant's employees accessed Plaintiff's servers.  Grecko Dep. 12, 21, 25, Mar. 1, 2012, *attached as* Def.'s Mot. Ex. Q.  In his deposition, the gentleman was asked:

Q: Are you aware of any evidence, do you have any fact that you could point to say that [Ms. Condon] actually accessed the Dice servers in Bay City, Michigan after she left the company?

A: No, there's no proof I can give you saying here's a document to say Amy did X, Y, Z.

Q: And there's no record or any — anything that would indicate that Amy made some type of unauthorized access the Dice system after she left her employment?

A: Well, as I explained earlier to you, that there's no way for me to tell. . . .

Q: So if Amy were to deny that she ever did that, that she ever accessed the Dice server [after] she left her employment, you would have no way to disprove that; is that fair?

A: That's fair.

Greko Dep. 21, 25.

# I

Plaintiff's complaint alleges that not only did Ms. Condon hack servers located in Dice's Bay City facility over the first two weeks of July 2011, but also over the next two weeks "Ms. Condon accessed Dice servers located at client sites and initiated file transfers of proprietary signal processing intelligence software."  Second Am. Compl. ¶ 12.  Ms. Condon again denies this accusation, explaining:

In July 2011 I was asked by an employee of ESC Central to assist her in writing a report using a product known as Thoroughbred Query which can locate files within the Dice software and generate a report.  It is my understanding that ESC owns the servers located in the Birmingham, Alabama office where the Query report was being run.  I did not log on to the ESC servers where the Query report was being run.  The login was done by the ESC employee using an ESC authorized user password.

One Thoroughbred Query which I drafted related to a file known as ALSCHART. Based on my prior employment with Dice, I knew that the ALSCHART file was available for access to any customer such as ESC and I was not aware of any restriction prohibiting a Dice customer such as ESC from accessing the ALSCHART file.

> I did not obtain a copy of any reports generated by the Query searches run during the incident in question referred to in the complaint by Dice, nor did I provide copies of the generated reports to Bold which were solely for ESC's own use.  I have never on any occasion provided Bold with a copy of the ALSCHART file.

Condon Aff. ¶¶ 3–5; *see also* Coles Aff. ¶ 7 ("Bold does not use Dice's ALSCHART codes as Bold has its own set of alarm codes that it uses.").

Plaintiff's director of software development, as noted, acknowledges that customers were permitted to query the ALSCHART file.  Coppens Dep. 22–23 (quoted above).  ESC Central's vice president, Ms. Jennings, confirms this.  In her deposition, she was asked:

> Q:  There was some claim by Mr. Dice in his deposition that this ALS[CHART] was off limits to customers.  You were on that system for almost ten years.  Did you ever hear anything like that before?
>
> A:  No, never.
>
> Q:  What was the F10 function?
>
> A:  That was a part of the [Thoroughbred] Query function.  We had actually paid for — we had actually paid Dice the year before for Amy to come down and do a training for us on Query, and it's something that we always struggled with, which is why that particular day that Amy was there she assisted in doing that whole functionality, but the ALS[CHART] codes was something that we were always in on a daily basis just about.

Jennings Dep. 48–49; *see also Dice Knowledge Base Article* 3 (Sept. 12, 2003) (user manual discussed above).  Turning to why Ms. Condon assisted ESC in querying the ALSCHART file in 2011, counsel asked:

> Q:  Had the data conversion from Dice to Bold been completed by the time Amy started working at Bold?
>
> A:  Yes.
>
> Q:  That was all done?
>
> A:  Yes.

Q:  Okay.  Did you any have any role with respect to converting the customer data from your Dice system to Bold?

A:  No. . . .

Q:  Now, just to be clear, Amy then had no role at all in converting the customer information from the old Dice system over to Bold?

A:  No.

Q:  Okay.  Now did Amy assist your company with an inquiry that you wanted done regarding the ALS[CHART] file in early August?

A:  Yes.

Q:  Tell me about that.

A:  It was a query that was ran.

Q:  Okay.  Who wanted the query run?

A:  One of my employees, I believe.

Q:  Okay.  And what information did ESC want?

A:  We actually had set up — upon moving off of Dice, we ran a lot of different things that we may have used then or may have used months earlier. Basically, we were just getting any information that we had that we might need in the future.

Q:  I'm sorry.  I really didn't follow.  I mean, what — what exactly from the ALS[CHART] did you need?

A:  Essentially, we — as far as the ALS[CHART] code goes, that's everywhere that I had gone in and established whether or not an operator would see the signal or if it was system handled, all of that.  So we just wanted a query that was a basis of here's what we've done over the last ten years of what we've created of how we handle every signal. . . .

Q:  Okay.  Do you know, the day Amy assisted with the query, what login was used?

A:  It was my login.

Q:  Your personal login?

A:  Yes.

Q:  Did you give permission for that?

A:  Yes.

Jennings Dep. 45–48, 51.

**J**

ESC Central's conversion from Plaintiff's software to Defendant's was completed in August 2011.  Jennings Dep. 10.  On August 5, Ms. Jennings posted a picture of herself holding two disconnected Dice cables on Facebook.  Greko Dep. 37.  Ms. Coppens, one of Ms. Jennings Facebook friends, saw the picture.  Coppens Dep. 27.  In her deposition, she was asked:

Q:  Okay. So what did you do when you saw the picture?

A:  I decided I needed to find out what was going on with our software.

Q:  And so how did you go about doing that?

A:  I went into the office and logged onto our — her system.

Q:  Whose system?

A:  ESC's system.

Q:  And how were you able to do that, I thought she had disconnected you?

A:   She actually had a web — had a phone system of ours and they did not remove access, so we were able to remote desktop into the machine, and they did not change any passwords, so you're able to log right in. . . .

Q:  Okay.  So why did you access her system?

A:  I wanted to see what happened.

Q:  Did you pick up the phone and call and ask her?

A:  There's no need to call her and ask her.

Q:  You didn't want to know why she unplugged your system?

A:  No.

Coppens Dep. 27–28.  Inquiring into what Ms. Coppens found after logging into ESC Central's

system, counsel asked:

> Q:  Okay.  And what happened next?
>
> A:  I logged into Dice and checked some files and then I went to see what queries
> were ran.
>
> Q:  Okay.  And what did you find?
>
> A:  It appeared that queries were ran in July that could have been used to convert
> off of Dice.
>
> Q:  To convert what?
>
> A:  Data off Dice.
>
> Q:  You mean the customer data?
>
> A:  Yes. . . .
>
> Q:  So these queries led you to believe that ESC wanted to take its data off of the
> Dice software and move it to a different software, right?
>
> A:  Uh-huh.
>
> Q:  Is that a yes?
>
> A:  Yes.
>
> Q:  That is what you suspected was going on?
>
> A:  Yes.
>
> Q:  Does the customer have the right to do that?
>
> A:  Sure.

Coppens Dep. 29–30.  Ms. Coppens took several screenshots of what she found before logging

off ESC Central's system.  In Mr. Dice's deposition, he was shown the screen shots and asked:

Q:  [I]n terms of the actual data that's in these files, has any of that data, the information, the comp numbers, the identifiers, does any of that information belong to Dice or is that the customer's?

A:  [It] is customer data, but again, it's — it's the — what's typed there and the extraction is very suspect because if you look at all of these as a whole — you know, you're trying to break it down one by one.  That isn't what it's about.  The fact that there's a thousand — there's over thousands of files and there's tens of thousands of fields and this particular site wrote some isolated queries that specifically not only took Dice property but actually systematically took exactly what was needed is an indication that the person who did this had more knowledge than a customer would.

Dice Dep. 147.  Asking Mr. Dice to elaborate, counsel later asked:

Q:  As I understand the overall complaint, you're not complaining that Bold took the customer data, right, you're not complaining about that?

A:  No.

Q:  They have the right to do that, correct?

A:  It was available to them on a CIS report.

Q:  You're just saying that there was a more labor-intensive way that they should have gone about doing the same thing that they did, right?

A:  Yeah, exactly.

Dice Dep. 221.  Mr. Dice's assertion, however, is in some tension with Plaintiff's own "customer implementation guide" that recommends electronic data transfer for new customers converting to Plaintiff's software, specifying:

DICE provides three primary methods to help you populate your DICE databases: manual conversion, medium data conversion, and wire-to-wire transfer. . . .

Dice usually recommends converting as much data as possible electronically . . . .

*Conversion Method #2: Medium Data Conversion*

Medium data conversion allows you to download database files from your old [software] system to compatible disks or tapes DICE can use.  Many reasons determine why this is a good one to use, including the following:

- 24 -

- Selection — from your existing data, you can select only the data that is necessary to transfer.

- Control — you control what fields to send to DICE for conversion.

- Speed — it is faster to use medium data conversion than trying to capture a report using wire-to-wire transfer.

*Conversion Method #3: Wire-To-Wire Transfer*

Wire-to-wire transfer captures reports from your current system into a file and then builds the data using the printed text data.  As with medium data transfers, many reasons determine why this method is beneficial, including the following:

- Compatibility — your current system might not have the capability to output data to a compatible disk or tape.

- Ease of use — you might not have the technical ability to format your data in a compatible format or compatible medium.

*Dice Success Customer Implementation Guide* 22–24 (2002) (emphasis omitted), *attached as* Def.'s Mot. Ex. E.

About ten days after Ms. Jennings posted the pictures on Facebook, Plaintiff brought suit in this Court.

## II

On August 16, 2011, Plaintiff filed a complaint against Defendant asserting claims for violations of Michigan's Uniform Trade Secrets Act ("MUTSA"), conversion, and unjust enrichment.  In October, Plaintiff filed its first amended complaint, adding claims for violations of the Computer Fraud and Abuse Act ("CFAA"), the Digital Millennium Copyright Act, and copyright infringement.

**A**

In November 2011, the Court entered a stipulated order dismissing the conversion and unjust enrichment claims and permitting Plaintiff to file a second amended complaint to revise its Computer Fraud and Abuse Act claim.  ECF No. 19.  Plaintiff did so.

On December 19, 2011, Defendant filed a motion to dismiss Plaintiff's Computer Fraud and Abuse Act because Plaintiff had not stated a claim on which relief could be granted.  More specifically, Defendant contended that Plaintiff had not alleged a "loss" within the meaning of the CFAA.  Noting that the motion to dismiss presented "a somewhat unusual question of statutory interpretation," the Court concluded that Plaintiff had sufficiently pleaded a "loss" within the meaning of the CFAA and denied Defendant's motion to dismiss.

More than six months later, on June 29, 2012, Defendant filed its motion for summary judgment on all Plaintiff's claims.  Defendant contended that Plaintiff had failed to identify any evidence during discovery that would support its claims.

This Court agreed with Defendant's contention and granted Defendant summary judgment on all of Plaintiff's claims.  Although Defendant relied on "deposition testimony, affidavits, and other evidence showing that it neither accessed Plaintiff's servers nor its software," Plaintiff's opposition was "based on conclusory assertions, not evidence."  Op. & Order 1.

Plaintiff then filed a motion for reconsideration on November 8, 2012.  In its motion, Plaintiff claimed that this Court improperly credited one of Defendant's affidavits and that Defendant improperly withheld evidence during discovery.  The Court concluded that these assertions were without merit.

**B**

Following the dismissal of its complaint, Plaintiff appealed to the Sixth Circuit Court of Appeals.  Plaintiff asserted that this Court had erred in granting Defendant's motion for summary judgment and denying its motion for reconsideration.

The Sixth Circuit affirmed the grant of summary judgment.  As in this Court, the Sixth Circuit concluded that Plaintiff had not presented evidence to support its claims.  Op., ECF No. 113 ("Dice failed to present competent evidence of misappropriation to the district court.") at 14; ("Dice did not cite any evidence of circumvention of technological measures to the district court") at 16; ("As for Dice's claim that Condon accessed Dice's servers to acquire the ALSCHART file, Dice has not presented any evidence.") at 18.

After the Sixth Circuit affirmed the grant of summary judgment, Defendant returned to this Court and filed a Renewed[4] Motion for Attorney Fees and Costs.  ECF No. 15.

**III**

In the context of deciding whether to award attorney's fees, questions of fact are committed to the discretion of the district court, even when decided before trial.  *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x 530, 536 (6th Cir. 2008).  "A judge, as the factfinder in the attorney-fee context, is not required to draw all inferences in favor of the non-moving party but instead is permitted to make factual findings in accordance with his or her own view of the evidence."  *Id.*

---

[4] Defendant had previously filed a motion for attorney's fees and costs on November 21, 2012 after this Court granted its motion for summary judgment.  However, because Plaintiff filed an appeal to the Sixth Circuit that same day, the Court denied the motion for attorney's fees and costs without prejudice so as to conserve judicial resources. ECF No. 106 at 2.

**IV**

Defendant contends that it is entitled to an award of attorney's fees and costs pursuant to several statutes: the Copyright Act, 17 U.S.C. § 505; Michigan Uniform Trade Secrets Act, Mich. Comp. Laws § 445.1905; and 28 U.S.C. § 1927.  It is undisputed that Defendant is the prevailing party.  As explained below, Defendant is entitled to attorney's fees and costs for the defense of Plaintiff's claims. However, the amount recoverable depends on which claim Defendant was defending against, i.e., Defendant is entitled to full recovery of all fees and costs associated with the defense of Plaintiff's trade secret misappropriation claim, but not necessarily to all fees and costs associated with the defense of Plaintiff's copyright claims. Accordingly, the Court will examine Defendant's entitlement to costs and fees under each statute.

**A**

The Michigan Uniform Trade Secrets Act ("MUTSA") provides that a court "may award reasonable attorney's fees to the prevailing party" if "a claim of misappropriation is made in bad faith . . . ."  Mich. Comp. Laws § 445.1905. Michigan courts have provided little guidance on what constitutes "bad faith" for purposes of the statute.  In *Degussa Admixtures, Inc. v. Burnett*, however, the Sixth Circuit concluded that the Michigan courts would interpret the "bad faith" requirement in the same way as their sister state courts:

> Although no Michigan court has defined "bad faith" under the Act, other courts construing identical provisions from other States have concluded, as the district court did here, that bad faith 'requires objective speciousness of the plaintiff's claim . . . and . . . subjective bad faith in bringing or maintaining a claim."

277 F. App'x 530 (citing *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 116 Cal. Rptr. 2d 358, 368 (2002) and *Berry v. Haw. Express Serv., Inc.*, 2007 WL 689474, at *13-15 (D. Haw. Mar. 2, 2007)).  Using this definition of "bad faith," the Sixth Circuit upheld an award of attorney's fees where the plaintiff "acknowledged that it had no direct

evidence that [the defendant] had used, or was threatening to use, its alleged trade secrets." *Id*. at 534.  Moreover, the plaintiff had acted in subjective bad faith because "[f]iling a trade-secret action to restrain legitimate competition and job mobility, needless to say, is not proper." *Id*. at 535-36.

Three years after the Sixth Circuit interpreted MUTSA's "bad faith" standard, the Michigan Court of Appeals affirmed an award of attorney's fees using that same interpretation. In *Whitesell Intern. Corp. v. Whitaker*, the Michigan Court of Appeals began by consulting Black's Law Dictionary (8th ed), which defined "bad faith" as "[d]ishonesty of belief or purpose."  The court then appeared to apply the Sixth Circuit's definition, without citation, explaining that both the objective and subjective components were present:

> The jury specifically found that [the plaintiff's] "lawsuit was so objectively baseless that no reasonable litigant could realistically be expected to win."  The jury also found that "Defendant['s] primary objective in bringing the June 23, 2005 lawsuit [was] to hurt Plaintiff . . . by bringing or continuing the lawsuit and not to obtain the relief sought in the suit."

2010 WL 3564841 (Mich. Ct. App. Sept. 14, 2010).  Thus, the Michigan Court of Appeals has at least tacitly approved the Sixth Circuit's definition of "bad faith", and this Court will follow the precedent established by these two courts.

Here, Plaintiff's trade secret claims were objectively specious.  When reviewing Defendant's motion for summary judgment, the Court concluded that Plaintiff did not satisfy any element of a misappropriation of trade secret claim: Dice neither identified a trade secret nor explained how such a trade secret was misappropriated.  Opinion and Order 23 ("In this case, Plaintiff establishes none of the three elements.").

Under Michigan law, "a party alleging trade secret misappropriation must particularize and identify the purportedly misappropriated trade secrets with specificity." *Dana Ltd. v. Am.*

*Axle & Mfg. Holdings, Inc.*, 2012 WL 2524008, at *9 (W.D. Mich. June 29, 2012).  Plaintiff

contended that the information contained in the ALSCHART constituted a trade secret.

However, Dice's customers had unrestricted access to the ALSCHART file.  Thus, the Court

concluded, "the undisputed evidence shows that the information obtained from the query of the

ALSCHART file in July 2011 was not a secret, much less a trade secret of Plaintiff."  Op. &

Order 25.  This conclusion was affirmed by the Sixth Circuit, which explained that:

> Dice fails to explain how [the ALSCHART], even if uniquely coded, is a trade
> secret. . . . Dice has not put forward an explanation of how the value of its unique
> labeling is derived from it not being readily ascertainable by proper means.  And
> Dice has not produced any evidence to that effect.

Order from U.S. Court of Appeals at 12.[5]

Plaintiff also failed to produce evidence of misappropriation by Defendant.  In response

to Defendant's motion for summary judgment, Plaintiff asserted that there is "overwhelming

evidence indicating that Bold routinely takes Dice's software and utilizes that software as a tool

for converting customer data."  Pl.'s Resp. 4.  The Court rejected this argument, noting that

"What this overwhelming evidence is, however, is left to the reader's imagination.  Plaintiff does

not offer any support for its assertion. . . . there is no issue of fact regarding whether Defendant

used Plaintiff's software in converting ESC Central's customer data: The undisputed evidence is

that Defendant did not."  Op. & Order 27.

The Sixth Circuit echoed this conclusion: "Dice failed to present competent evidence of

misappropriation to the district court.  Noting the fact that Dice did not cite *any* record evidence .

. . . The district court did not err in rejecting Dice's conclusory allegations of misappropriation in

the face of competent evidence to the contrary."  Order at 13.

---

[5] For the first time on appeal, Plaintiff asserted that its receiver drivers are also a trade secret.  The Sixth Circuit rejected this argument *in toto*: "Dice failed to present competent evidence of misappropriation to the district court. Second, much like the ALSCHART claim, Dice has never put forward any evidence, let alone make the argument, that its receiver drivers are actually a trade secret."  Order at 14.

In sum, Plaintiff did not produce any evidence or establish even a single element of trade secret misappropriation under Michigan law.  Accordingly, Plaintiff's misappropriation claim under MUSTA was objectively specious, satisfying the first requirement of a finding of bad faith.  *See Sun Media Systems, Inc. v. KDSM, LLC*, 587 F. Supp. 2d 1059, 1079 (S.D. Iowa 2008) (applying Iowa law, the court found bad faith on the part of a plaintiff who brought a misappropriation claim where it produced no evidence of misappropriation).

In addition, the record indicates that Plaintiff may have brought this suit with an improper motive—preventing customer defection to Defendant.  As in *Degussa*, the record suggests that Plaintiff's "own product-quality . . . and market shortcomings led it to file this action in an attempt to slow the bleeding from those self-inflicted wounds—to avoid losing additional market share and salespeople."  *Degussa* at 535.  Because "[f]iling a trade-secret action to restrain legitimate competition . . . is not proper," bad faith may be reasonably inferred from such efforts.  Accordingly, Defendant will be awarded attorney's fees with respect to its defense of Plaintiff's trade secret misappropriation claims.

Whether a company possesses a trade secret is within the company's own knowledge; for that reason it would be disingenuous for Dice to contend that it could not have known whether it possessed a trade secret until after discovery concluded. Indeed, Dice does not attempt to make such an argument. Instead, Dice only argues that it could not have known whether any misappropriation had occurred until after discovery. While it may be true that the fact and method of Defendant's alleged misappropriation may not have been known, only Plaintiff knew whether it possessed a trade secret. It is impossible to "misappropriate" a non-existent trade secret. Plaintiff did not possess a trade secret, knew it did not possess a trade secret, but nonetheless brought a trade secret misappropriation claim against Defendant. Thus, Plaintiff's

assertion of a trade secret claim in its complaint was made in bad faith, and Defendant is entitled to attorney's fees associated with defending against the misappropriation claim from its inception.

## B

MUTSA only permits the recovery of attorney's fees for trade secret misappropriation suits. Nevertheless, Defendant asserts that it is entitled to costs associated with defending against the trade secret misappropriation claim pursuant to 28 U.S.C. § 1927. Sanctions under § 1927 may be awarded against a party for conduct that "multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927; *see also Rentz v. Dynasty Apparel Indus.*, 556 F.3d 389, 396 (6th Cir. 2009). An award of fees under § 1927 requires a showing of "more than negligence or incompetence" by a party but "less than subjective bad faith." *Hall*, 595 F.3d at 276 (internal quotation marks omitted); *see also Dixon v. Clem*, 492 F.3d 665, 679 (6th Cir. 2007) ("To be sure, a finding of bad faith is not a necessary precondition . . . to a determination of § 1927 sanctionability."). The purpose of a sanctions award under this provision is to "deter and punish those who abuse the judicial process," *Red Carpet Studios*, 465 F.3d at 645, not to compensate the moving party. *Id.* at 647.

As noted above, bad faith is not a prerequisite for sanctions under § 1927, but it is sufficient to impose sanctions. The Court has already determined that Plaintiff brought its trade secret misappropriation claim in bad faith, and therefore Defendant is entitled to recover the costs associated with defending against those claims. Accordingly, Defendant would be entitled to costs associated with defense of the misappropriation claims pursuant to § 1927.

**C**

In addition to fully recovering all reasonable attorney's fees and costs associated with defense of the trade secret misappropriation claims, Defendant also seeks to recover the fees and costs associated with the defense of Plaintiff's copyright claims. The Copyright Act permits an award of "reasonable attorney's fees to the prevailing party" in a copyright infringement case. 17 U.S.C. § 505; *Thoroughbred*, 488 F.3d at 361. "The grant of fees and costs is the rule rather than the exception and they should be awarded routinely.'" *Bridgeport Music, Inc. v. WB Music Corp. (WB Music II)*, 520 F.3d 588, 592 (6th Cir. 2008) (quoting *Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 380 (5th Cir. 2004)) (internal alteration omitted). Nevertheless, the decision to grant attorney's fees remains within the trial court's discretion. 17 U.S.C. § 505; *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994).

The Sixth Circuit employs "four non-exclusive factors to determine whether to award attorney's fees in a copyright action." *Thoroughbred*, 488 F.3d at 361 (citing *Coles v. Wonder*, 283 F.3d 798, 804 (6th Cir. 2002)). These four factors include: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case)[,] and the need in particular circumstances to advance considerations of compensation and deterrence." *WB Music II*, 520 F.3d at 588. These factors may be "used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner."[6] *Fogerty*, 510 U.S. at 534 n. 19.

---

[6] Attorney's fees and costs are recoverable under the DMCA and are governed by the same standard. Accordingly, the Court will address them together. *See Unicom Sys., Inc. v. Farmers Grp., Inc.*, 405 F. App'x 152, 155 (9th Cir. 2010*); Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC*, 2014 WL 1117909, at * 6 (E.D. Va. Mar. 19, 2014); *Tylor v. Welch*, 2014 WL 1415006, at *8 (D. Haw. Apr. 11, 2014).

**i**

The first *Fogerty* factor addresses a plaintiff's motivation in bringing the lawsuit. Plaintiffs are improperly motivated if they do not have "a good faith intent to protect a valid interest, but rather a desire to discourage and financially damage a competitor by forcing it into costly litigation." *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 140 F. Supp. 2d 111, 116 (D. Mass 2001). Defendant believes that the purpose of this litigation was to "try to stem the flow of customers from Dice to Bold." Mot. at 4. The record contains suggestions of a level of animus on Plaintiff's part including: (1) the fact that the parties are competitors in a competitive market; (2) several of Plaintiff's customers have defected to Defendant; (3) subsequent to filing this lawsuit, Plaintiff sent out a press release to customers informing them of the lawsuit. The October 3, 2011 press release is some evidence that Plaintiff brought the lawsuit to prevent customer defection:

> It has recently been brought to our attention that many of our client companies have been contacted by Bold Technologies, Inc., regarding services and conversion. Bold has contacted numerous clients with statements that they can equal or exceed Dice's product and services at a lower cost, and without any problems related to data conversation. Please review the facts and assertions contained in the enclosed federal court complaint.[7]

Mot. Ex. 1. The press release communication to Plaintiff's clients supports an inference that Plaintiff was improperly motivated in bringing this lawsuit, which weighs in favor of awarding costs and attorney's fees.

---

[7] The press release contrasts with President Dice's initial responses to concerns about Plaintiff's product: "We have to [pare] down the number of clients we have and serve due to the larger scale of the product line currently. Once folks see what our direction is and what our development cycles are[,] [i]f they are not pleased with our direction, *they should contact the competition and move quickly to another [software provider] as you indicated, [and] I would encourage it.*" Def.'s Mot. Summ. J., Ex. H (emphasis added).

**ii**

The second factor concerns whether the copyright infringement suit was frivolous or objectively unreasonable. "'Objective unreasonableness' is generally used to describe claims that have no legal or factual support." *Viva Video, Inc. v. Cabrera*, 9 F. App'x. 77, 80 (2d Cir. 2001).

Here, Plaintiff's copyright claims were objectively unreasonable. This case did not involve any complex or novel issues of law, nor did Plaintiff develop an issue of fact. As this Court and the Sixth Circuit repeatedly found, Plaintiff did not present any evidence that would suggest that its claims had merit. In this Court's opinion and order granting Defendant's motion for summary judgment on Plaintiff's copyright claims, the Court repeatedly concluded that Plaintiff had offered no evidence of copyright infringement:

- "The opposition, however, is based on conclusory assertions, not evidence." at 1.

- "In this case, there is no evidence of unauthorized access of Plaintiff's copyrighted materials by Defendant." at 29.

- "In sum, there is no evidence that Defendant circumvented Plaintiff's security measures to gain unauthorized access to Plaintiff's copyrighted materials." at 31.

- "Plaintiff does not elaborate on how Defendant allegedly decrypted Plaintiff's software, much less offer facts suggesting this." at 32.

- "In this case, as in *R.C. Olmstead*, Plaintiff does not attempt to identify any original elements of its software that Defendant allegedly copied. Unlike *R.C. Olmstead*, moreover, Plaintiff does not even offer a comparison of the software of the respective companies." at 34.

- "As the undisputed evidence is that Defendant did not use Plaintiff's software, much less use it for the principal purpose for which it was designed, Defendant is entitled to summary judgment on Plaintiff's copyright infringement claim." at 36.

*See* Op. & Order, ECF No. 93. That Plaintiffs did not provide evidence to support their copyright claims is reiterated in this Court's opinion denying its request for reconsideration:

- "Plaintiff opposed the motion [for summary judgment] with conclusory assertions, not evidence." at 1.

- "Yet a review of those pages (as well as the remainder of the gentleman's deposition) shows Plaintiff's [copyright] assertion lacks a factual foundation – in his deposition Mr. Narwoski never said that he used Dice source code or required customers to provide him with such information.  And in his affidavit he made plain that he did no such thing." at 10.

- "In sum, nowhere in Mr. Narowski's deposition does he testify that he 'used Dice source code' or 'admitted requiring customers to provide him with such confidential information.'" at 13.

- "Rather, as previously noted, Defendant supported its motion for summary judgment with 'deposition testimony, affidavits, and other evidence' from numerous sources, while Plaintiff opposed the motion with only 'conclusory assertions, not evidence.'" at 14.

- "Plaintiff did not come forward with such facts in opposing Defendant's motion for summary judgment. And has not done so now." at 15.

- "Mr. Dice does not, however, explain how this program demonstrates that Defendant used Plaintiff's source code in the conversion process.  Instead, he attaches a computer printout to his affidavit that Defendant charitably describes as "virtually incomprehensible" . . . The Court's own review, in contrast, finds the document completely incomprehensible." at 15-16 n.1.

Order Denying Mot. for Reconsideration, ECF No. 104.  Moreover, Plaintiff was unable to point to any evidence of copyright infringement when it appealed to the Sixth Circuit:

- "Dice has not attempted to demonstrate which aspects of its programs were protectable.  Dice does not identify any original elements in its software and does not argue that the receiver drivers represent non-functional expression." at 15.

- "Dice failed to identify the original and non-functional elements of its work. Instead, it provided hundreds of pages of incomprehensible computer code without explanation . . . ." at 15.

- "Dice did not cite any evidence of circumvention of technological measures to the district court. . . . [T]o the extent we are inclined to allow Dice to resurrect this argument, Dice cites no evidence." at 16.

Opinion from U.S. Court of Appeals, ECF No. 113.  In sum, at no point during the litigation did Plaintiff present any evidence that supported its copyright claims, making those claims objectively unreasonable.

Plaintiff contends that it could not have known at the outset of litigation precisely what actions Bold took.[8]  Unlike the trade secret claim, this may be true enough for the copyright claim, but by the time discovery closed, the evidence—or complete lack of evidence— demonstrated that Plaintiff's claim was objectively unreasonable.  *See Coles v. Wonder*, 283 F.3d 798 (6th Cir. 2002) (District court did not abuse its discretion in awarding costs and attorney's fees in copyright suit where the claims asserted—while not necessarily frivolous, were objectively unreasonable.); *Jones v. Blige*, 558 F.3d 485, 494 (6th Cir. 2009) ("Nor, as the case progressed, did Plaintiffs conduct themselves in a manner that would justify us in finding that the district court's decision not to award fees was an abuse of discretion.").

Plaintiff did not provide factual support for its copyright infringement allegations, and therefore the copyright claims were objectively unreasonable.  Accordingly, this factor weighs in favor of awarding Defendant costs and attorney's fees.

### iii

The third factor—compensation—also weighs in favor of awarding costs and attorney's fees.  Defendant has not received an award of damages by successfully defending against this action.  It has, however, incurred substantial expenses in defending against the claims.  As the Seventh Circuit explained regarding a defendant's defense against copyright infringement claims:

---

[8] It is notable that when a plaintiff filed "a complaint with no genuine idea as to whether a claim existed," the Sixth Circuit concluded that an award of attorney's fees under the Copyright Act was appropriate.  *See National Business Development Services, Inc. v. American Credit Educ. and Consulting Inc.*, 299 F. App'x 509, 513 (6th Cir. 2008).

> When the prevailing party is the defendant, who by definition receives not a small award but no award, the presumption in favor of awarding fees is very strong. For without the prospect of such an award, the party might be forced into a nuisance settlement or deterred altogether from enforcing his rights.

*Assessment Technologies of WI, LLC v. Wire Data, Inc.*, 361 F.3d 434, 437 (7th Cir. 2004) (citations omitted).   The Seventh Circuit's reasoning is sound.   Even though Defendant successfully defended against all of Plaintiff's copyright claims, it did not recover any monetary award for doing so.   An award of costs and fees to Defendant ensures that, despite the expense of litigation without any monetary award, they can defend against objectively unreasonable cases.

### iv

Closely related to compensation is the need for deterrence.   "Awarding attorney fees against a party with an objectively reasonable claim will send a message that such plaintiffs, in the hopes of achieving a settlement, should not force others to unnecessarily spend hundreds of thousands of dollars to defend themselves."   *Coles v. Wonder*, 283 F.3d 798, 803 (6th Cir. 2002).

Moreover, fee awards to copyright defendants serve a purpose loftier than mere compensation: rewarding a successful defense that "enrich[es] the general public through access to creative works."   *Fogerty*, 510 U.S. at 527.   Here, the rationales that underlie copyright law favor limitation.   Defendant should accordingly be "encouraged to litigate [meritorious copyright defenses] to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement."   *Id.* Society's interest in the assertion of meritorious defenses to unreasonable copyright claims is achieved through the award of all fees incurred in connection with the claim and related "claims involve[ing] a common core of facts or . . . legal theories."   *Hensley*, 461 U.S. at 435.

An award in this case will deter other would-be plaintiffs from bringing equally unreasonable lawsuits against others. Therefore, this factor weighs in favor of an award for costs and attorney's fees.

In sum, all of the factors—motivation, objective unreasonableness, compensation, and deterrence—support an award of costs and attorney's fees. Accordingly, Defendant's motion for costs and attorney's fees for defense of Plaintiff's copyright claims will be granted.

## D

In addition to costs and attorney's fees related to its defense of the copyright claims, Defendant may also recover fees it incurred in defending against claims that "involve[d] a common core of facts or [were] based on related legal theories." *The Traditional Cat Ass'n v. Gilbreath*, 340 F.3d 829, 833 (9th Cir. 2003). It is well-established law that a party is entitled to attorney's fees as a prevailing party only on a particular claim, but not on other claims in the same lawsuit, unless they are "related claims." *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983).

"Hours expended on unrelated, unsuccessful claims should not be included in an award of fees." *Sorenson v. Mink*, 239 F.3d 1140, 1147 (9th Cir. 2001). Courts must be careful to correctly distinguish time spent on "unrelated" claims versus time "devoted generally to the litigation as a whole." *Sorenson*, 239 F.3d at 1147 (quoting *Hensley*, 461 U.S. at 435) (internal quotation marks omitted). Cases with multiple claims involving "a common core of facts" that are "based on related legal theories" often "cannot be viewed as a series of discrete claims." *Id.* (quoting *Hensley*, 461 U.S. at 435) (internal quotation marks omitted).

Here, Defendant's successful defense of Plaintiff's CFAA claim, 18 U.S.C. § 1030, is a "related claim" such that Defendant may recover costs and attorney's fees for its defense under

the Copyright Act. Plaintiff's CFAA and Copyright claims arose from a common core of alleged facts: that Ms. Condon gained unauthorized access to Plaintiff's servers and software. *See* Compl. ¶ 29 ("Bold has utilized this unauthorized access to Dice software to unwarily compete against Dice"); Compl. ¶ 39 ("Bold's access to confidential and proprietary information contained on the Dice servers was both intentional and without authorization."). Because Plaintiff's claims arose from the same alleged set of facts, Plaintiff's CFAA claim is related to Plaintiff's copyright claims, and Defendant may recover costs and attorney's fees associated with defense of the CFAA claim.

**E**

Although Defendant is entitled to a recovery of attorney's fees and costs associated with its defense of Plaintiff's copyright and CFAA claims, it is not necessarily entitled to all the fees and costs incurred since the inception of the lawsuit. Unlike Plaintiff's trade secret misappropriation claim, it is not clear that Plaintiff's copyright and CFAA claims were brought—at least at the time the complaint was filed—in bad faith. Indeed, the Court is willing to credit Plaintiff's assertion that "[f]rom the beginning of this case . . . there were serious questions of whether Bold was obtaining and using Dice's copyrighted software without Dice's permission to facilitate the conversion of customers to Bold." Pl.'s Resp. 23.

Plaintiff's serious questions did not demonstratively remain "through summary judgment." Pl.'s Resp. 23. At some point during discovery, the developing facts should have indicated to Plaintiff that maintaining its Copyright and CFAA claims would be objectively unreasonable. For example, this point may have occurred when every witness questioned denied that "circumvented security measures" led to access to Plaintiff's software. *See* Greko Dep. 21, 25 ("Q: So if Amy were to deny that she ever did that, that she ever accessed the Dice server

[after] she left her employment, you would have no way to disprove that; is that fair? A: That's fair."); Dice Dep. 28 ("Q: [D]oes Dice . . . encrypt its software? A: We don't have the capacity to encrypt at an object code level. We can encrypt a source code, but we've had problems with it in the past so we tend not to encrypt anything."). The information brought forth by these depositions indicates that Plaintiff would not be able to identify any evidence that Defendant circumvented security measures in violation of copyright law. Following the depositions, then, Plaintiff should have realized that it could not maintain its copyright claims. Plaintiff, of course, may disagree, and therefore Plaintiff will be invited to explain when it knew or should have known that it could not produce any evidence to support its claims.

To summarize, Defendant has carried its burden of showing that it is entitled to at least some of the attorney's fees and costs associated with defending against Plaintiff's copyright and CFAA claims. However, the question remains: How much is Defendant entitled to?  Defendant is entitled to all costs and fees associated with assembling its motion for summary judgment, given that at that time Plaintiff had adduced no evidence supporting the claims made in its complaint. But it may have been apparent even earlier in the discovery that the evidence would not corroborate Plaintiff's initial assertions, and Defendant would be entitled to costs and fees from that point forward. Accordingly, Plaintiff will be directed to provide supplemental briefing regarding Plaintiff's "serious questions" and the later determination that there was no evidence to support its copyright and CFAA claims—given that the Court has already determined that it should have known, at the latest, by the close of discovery.

## F

In conclusion, Defendant is entitled to costs and attorney's fees it incurred in defending against Plaintiff's trade secret misappropriation claim, which was brought in bad faith. Thus,

Defendant is entitled to reasonable attorney's fees (pursuant to MUTSA) and costs (pursuant to § 1927) associated with the defense of the misappropriation from its inception. Defendant will be directed to supply supplemental briefing detailing the extent of the fees and costs it incurred in defending against the trade secret misappropriation claim.

In addition, Defendant is entitled to costs and attorney's fees incurred in defending against Plaintiff's objectively unreasonable claims pursuant to the Copyright Act, 17 U.S.C. § 505. The evidence suggests that Plaintiff brought its objectively unreasonable copyright claims with an improper motive—to prevent customer defection. Moreover, the need for Defendant to be compensated and the need for deterrence weigh in favor of granting Defendant's request for costs and fees.

Plaintiff is also entitled to costs and fees associated with the defense of Plaintiff's CFAA claim. The CFAA claim arose from the same set of operative facts—that Ms. Coppen allegedly gained unauthorized access to Plaintiff's servers to steal Plaintiff's proprietary information and software. Therefore, Defendant's request for attorney's fees and costs on the CFAA claim pursuant to the Copyright Act, 17 U.S.C. § 505, will be granted.

However, in contrast to Plaintiff's trade secret misappropriation claim, the Court will credit Plaintiff's assertions that it needed some discovery to corroborate its suspicions that it could maintain viable copyright and CFAA claims. Thus, Defendant will be entitled only to those costs and fees incurred from the time Plaintiff can demonstrate that it concluded that it had no evidence to support its claims. It will be up to Dice, in supplemental briefing, to demonstrate what evidence, if any, there was supporting their initial suspicions and the point Dice knew or should have known that its copyright and CFAA claims did not have any supporting evidence.

**V**

Having determined that Defendant is entitled to costs and attorney's fees related to its defense of Plaintiff's claims, the Court may only award "reasonable" fees. Courts, in determining the amount of reasonable attorney's fees, use the "lodestar" approach outline in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). The lodestar amount is established by multiplying a reasonable hourly rate by the number of hours expended by attorneys on the case. *Id.* at 433; *Bldg. Svc. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995). There is a "strong presumption" that the lodestar figure is reasonable. *Bldg. Svc.*, 46 F.3d at 1401. The party seeking attorney fees bears the burden of documenting his entitlement to the award with evidence supporting the hours worked and rates claimed. *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 617 (6th Cir. 2007).

Defendant seeks to recover $277,599.11 in fees and costs for amounts billed through January 31, 2014. Plaintiff, however, contests this amount. Among other things, Plaintiff contends that defense counsel's hourly rates are unreasonably high and that many of their hours consist of duplicative work and were unnecessary. There are several disputed factual scenarios concerning Defendant's requested amount, and therefore a hearing on these issues is likely necessary. Nonetheless, an overview of Plaintiff's assertions is detailed below.

**A**

To determine a reasonable hourly rate, the Supreme Court has held that a court should use the "prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). The prevailing market rate has been defined in the Sixth Circuit as the rate that "lawyers of comparable skill and experience can reasonably expect to command within the venue of the

court of record." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) (citing *Adcock—Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000)).

In this case, Defendant seeks to recover attorney's fees for the five attorneys who represented it before this Court and on appeal to the Sixth Circuit: Mr. Cataldo, Mr. McDaniel, Mr. Falkenstein, Mr. Rose, and Mr. Shannon. Each of these attorneys' hourly rate fell between $265 and $400 per hour. Defendant also seeks to recover fees associated with the work performed by paralegal Katherine Janulis, whose hourly rate was $170. To determine whether these rates are reasonable, a court usually (1) reviews an attorney's credentials, (2) consults the State Bar of Michigan's Economics of Law Practice Survey, and (3) considers any affidavits detailing common practice among similar attorneys in the community. *Huizinga v. Genzink Steel Supply and Welding Co.*, 2013 WL 6158466, at *7 (W.D. Mich. Nov. 25, 2013).

**i**

Mr. Cataldo has been practicing law for 26 years, all with Jaffe Raitt Heuer & Weiss. His declaration provides that "I regularly serve as lead counsel in complex commercial litigation matters, including cases involving intellectual property issues." ¶14. Mr. Cataldo served as lead counsel in this case during proceedings in this Court, and he assisted others during the proceedings on appeal. ¶ 5-6.

Mr. Cataldo was assisted in the litigation in this Court by Mr. McDaniel and Mr. Falkenstien. Mr. McDaniel "has significant experience in complex commercial litigation matters, including cases involving copyright infringement, trade secret theft and other intellectual property claims." ¶ 16. Mr. Falkenstein also has extensive experience with complex commercial litigation and intellectual property claims; "[h]e has been named a Michigan Super Lawyer in Intellectual Property Law by Super Lawyers Magazine every year that the designation

has been awarded." ¶ 18.  During the course of the litigation, Mr. McDaniel had an hourly rate between $265 and $285, while Mr. Falkenstein's rate increased from $330 to $350 per hour.  ¶¶ 16, 18.

On appeal, Mr. Cataldo worked with Mr. Rose and Mr. Shannon.  Mr. Rose "was named by Super Lawyers Magazine as a Michigan Rising Star for 2008 and 2010-2013 . . .  and specializes in appellate work.  Mr. Shannon is the head of his firm's Appellate Practice Group and focuses entirely on appellate litigation.  Mr. Rose charged an hourly rate of $300 while Mr. Shannon's hourly rate increased from $350 to $375.

Paralegal Katherine Janulis assisted the attorneys with their work.  During the litigation, Ms. Janulis's hourly rate increased from $170.00 to $190.00.

**ii**

Comparing these requested rates to the documentation reviewed by the Court, the most recent State Bar of Michigan's 2010 Economics of Law Practice Survey indicates that litigation attorneys in the metropolitan Detroit area with similar years of experience as Mr. Cataldo, Mr. McDaniel, and Mr. Falkenstein charge a mean of $290.00 per hour, while the 75th percentile was $375.00 and the 95th percentile was $525.00.

The rates for attorneys who specialize in intellectual property and appellate law are similar to the rates charged in the metropolitan Detroit area.  The mean hourly rate for intellectual property and trade secret attorneys was $287.00, while the 75th percentile was $350.00 and the 95th percentile was $455.00.  For appellate attorneys like Mr. Rose and Mr. Shannon, the mean hourly rate was $259.00, while the 75th percentile was $320.00 and the 95th percentile was $450.00.

Although Defendants' attorneys' hourly rates fall near the high end of the range, courts in this district have routinely held that attorney's fees between $330.00 and $561.00 per hour in intellectual property lawsuits are reasonable. *See Controversy Music v. Packard Grill, LLC*, 2011 WL 317736, at *5 (E.D. Mich. Feb. 1, 2011) ($330.00 hourly fee reasonable); *Chambers v. Ingram Book Co.*, 2012 WL 933237, at *9 (E.D. Mich. Mar. 20, 2012) ($375.00 hourly fee reasonable); *RDI of Michigan, LLC v. Michigan Coin-Op Vending, Inc.*, 2010 WL 625397, at *3 (E.D. Mich. Feb. 18, 2010) ($400.00 hourly fee reasonable); *Pollick v. Kimberly-Clark Corp.*, 2012 WL 1205647, *3 (E.D. Mich. Apr. 11, 2012) ($561.00 hourly fee reasonable).

Moreover, Defendant has provided the affidavit of attorney George Mousakas, who works for a Michigan-based firm that specializes in intellectual property. "Based on [his] experience litigating intellectual property matters and [his] understanding of this case," Mr. Mousakas offered his opinion that "the amount billed to Bold by the Jaffe firm to date represents a reasonable charge for the services provided by Jaffe in defending against Dice's claims." Ex. 6 at 8. Moreover, Mr. Mousakas asserted that the hourly rates charged by defense counsel were "commensurate with rates charged by attorneys of similar backgrounds and experience for the litigation of non-patent intellectual property cases in the United States District Court for the Eastern District of Michigan." *Id.*

### iii

Plaintiff makes several challenges to the reasonableness of Defendants' counsel's hourly rates. First, it alleges that the relevant legal community is the Bay City/Midland/Saginaw area, not the Detroit metropolitan area. Plaintiff suggests that the hourly rates charged far exceed the typical hourly rates found in Bay City/Midland/Saginaw area, which is in the Northern Division of the Eastern District of Michigan. However, the Sixth Circuit has held that, for purposes of

evaluating a reasonable hourly rate, a court should look to what "lawyers of comparable skill and experience can reasonably expect to command within *the venue of the court of record*." *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004) (emphasis added).  Although this Court is located in the Northern Division of the Eastern District of Michigan, it would be unreasonable to suggest that the venue for clients located in the Northern Division is limited to attorneys residing in the Northern Division.  It is particularly common for parties to seek specialized representation for specialized issues from firms located in metropolitan Detroit, which is located in the Eastern District of Michigan, and various other larger cities.  Accordingly, it was not unreasonable for Defendant to retain a law firm with experience in commercial litigation and intellectual property law.  Moreover, Plaintiff does not identify any attorneys or firms in that geographic area that similarly specialize in intellectual property or trade secret law.  Accordingly, Defendant will not be limited to the rates charged by attorneys in the Bay City/Midland/Saginaw geographic area.

Second, Plaintiff contends that Defendant's rates should be reduced because "partners appear to have conducted every single aspect of this litigation at very high hourly rates without taking advantage of lower associate rates for appropriate tasks."  Resp. 37.  However, as Mr. Cataldo testifies, associates at his law firm "expended over 70 hours performing research and other tasks on this case."  Reply Ex. 7 at 10.  But, Defendant does not seek reimbursement for the time expended by associates working on the matter.  Accordingly, the fact that partner-level attorneys handled the majority of the litigation does not warrant a reduction in their hourly rates.[9]

Defendants' requested hourly rates are reasonable.  Defendant's attorneys have demonstrated knowledge and reputation in the area of intellectual property law and appellate litigation, and their rate is commensurate with the prevailing rate for attorneys with their

_____

[9] At least one court, however, has reduced the lodestar amount by 25% to "account for top-heavy billing by partners for work that could have been performed by associates."  *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 596 (6th Cir. 2008).

experience in this market. Thus, Defendant's attorneys' requested rates for the work they performed on this case are accepted.

However, with regard to Ms. Janulis's hourly rate for paralegal assistance, the available evidence does not justify her rate. Defendant has not proffered any evidence, as is its burden, demonstrating that Ms. Janulis's hourly rate was reasonable. The State Bar of Michigan's 2010 Economics of Law Practice Survey does not address the average paralegal hourly rate, and attorney George Moustakas's affidavit references only the reasonableness of the attorneys' hourly rates—not Ms. Janulis's. Because Defendant has not proffered sufficient evidence to show the reasonableness of Ms. Janulis's hourly rate, the rate will be reduced to accord with the hourly rate awarded for paralegal work in similar copyright cases. Accordingly, the Court believes that a reasonable rate for Ms. Janulis's work is $150.00 per hour. *See Pollick v. Kimberly-Clark Corp.*, 2012 WL 1205647, *3 (E.D. Mich. Apr. 11, 2012) ($ 157.25 hourly fee for paralegal work reasonable).

**B**

The next issue relates to Defendant's calculation of hours invested in this litigation. In determining reasonable hours, the Supreme Court held that attorneys seeking fees pursuant to a statute are expected to use the same "billing judgment" as a private attorney would use in billing a client. *Hensley*, 461 U.S. at 434. This judgment requires attorneys to make a good faith effort to exclude hours that are "excessive, redundant, or otherwise unnecessary." *Id*. The party requesting fees must present the court with enough detail to determine whether the hours were "actually and reasonably expended in the prosecution of the litigation." *United Slate, Tile and Composition v. G & M Roofing and Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984). The fee applicant "has the burden of demonstrating the reasonableness of hours and the opposing

party has the burden of producing evidence against this reasonableness." *Anglo – Danish Fibre Indus. v. Columbian Rope Co.*, 2003 WL 223082, at \*4 (W.D. Tenn. Jan. 28, 2003).

"[C]ourts have held that it is improper to engage in an 'ex post facto determination of whether attorney hours were necessary to the relief obtained.' The issue 'is not whether hindsight vindicates an attorneys' time expenditures, but whether at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" Hirsch and Sheehy, *Awarding Attorneys' Fees and Managing Fee Litigation* (2nd Edition), Federal Judiciary Center 2005, p. 26 (citing *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990)).

In the instant case, Defendant seeks fees for hundreds of hours of work. It submitted a billing statement to support its request, which includes a description of the work the attorneys and paralegal performed and the length of time each attorney spent on each task. Defendant maintains that the attorneys reviewed the billing statement for reasonableness prior to submitting it, and that it redacted portions of the statement that they determined to be unreasonable. Plaintiff, in contrast, contends that the number of hours submitted are unreasonable, unnecessary to Defendants defense, and duplicative.

**i**

Plaintiff first contends that Defendant has not shown that Mr. McDaniel's hours are not reasonable because he failed to describe them. Specifically, it points to the numerous redactions in his billing records: Mr. McDaniel logged about 107.1 hours of redacted entries. Because Mr. McDaniel has redacted the description of his work, Plaintiff claims that it is "impossible to determine the amount of time spent on specific tasks and whether such time was reasonable." Pl.'s Resp. at 38.

However, in an affidavit attached to Defendant's renewed motion, Mr. McDaniel attests that the redactions were necessary to prevent disclosure of privileged attorney-client information. Ex. B 2. Because the Court is unable to determine whether Mr. McDaniel's 107.1 hours of work were reasonable, the unredacted billing records need to be submitted for *in camera* review.

### ii

Plaintiff also contends that the time Mr. Cataldo and Mr. McDaniel spent communicating with the press should be excluded from the attorney's fees calculation. Defense counsel logged approximately 7.8 hours responding to reporters and reviewing media articles. *See* Ex. 5 at 2 ("Call With Reporter; Review Article and Follow Up"; "Call with Reporter"; "Review and Comment on Bold Press Statement"). Defense counsel has not explained how interacting with the press was necessary to the defense of Plaintiff's legal claims, and therefore these fees will not be recoverable.[10]

Similarly, Plaintiff contends that the time Mr. McDaniel spent preparing a (never-filed) counterclaim should be excluded. Again, defense counsel does not explain how preparing a counterclaim that was not ultimately filed was necessary to their successful defense. Accordingly, Defendant will not be able to recover those fees.[11]

### iii

Plaintiff contends that the hours expended by Mr. Falkenstein are "unneccesarily duplicative." Resp. at 36. Almost all of Mr. Falkenstein's hours were spent "reviewing" briefs, motions, and orders or conducting telephone conferences with Mr. McDaniel. *See* Mot. Ex. A at

---

[10] It cannot be determined exactly how much should be excluded from the attorney's fees calculation because, in some instances, defense counsel used block billing. For example, on August 31, 2011, Mr. Cataldo logged .8 hours of billable time for speaking with a reporter and calling Plaintiff's attorney. Because the Court does not have enough information to separate the billable time for the two actions, there are two options: it can either have defense counsel submit supplemental briefs, or it can just divide the billable time pro rata among the listed actions.

[11] Again, Mr. McDaniel also used block billing in documenting his billable hours. Therefore, the Court cannot determine precisely how much time Mr. McDaniel spent on preparing the counterclaim.

8-10 ("Tel. Conference D. McDaniel RE: Copyright Issues"; "Reviewing and Replying to E-Mails RE: Motion to Dismiss in Part"; "Review Stipulated Order; Tel. Conference with Judge's Chambers; Draft E-Mail to Counsel"; "Review and Revise Motion to Dismiss CFAA Claim"). In response, Defendant explains that "Mr. Falkenstein is a highly experienced intellectual property lawyer, and it is commonplace, and indeed good practice, to consult with other lawyers who possess expertise related to a particular case."  Reply 10.

Defendant is free, of course, to consult and hire as many attorneys as it sees fit to represent its interest in this litigation.  However, it is not necessarily allowed to recover all the attorney fees incurred by all attorneys it consulted.  In this case, Defendant was protected at all times by competent counsel: Mr. Cataldo and Mr. McDaniel.  Nonetheless, counsel consulted with Mr. Falkenstein and had him review various documents related to the litigation.  Aside from reviewing and revising documents and discussing the litigation, Mr. Falkenstein does not appear to have taken on any other role in the litigation.  As such, it does not appear that Mr. Falkenstein's involvement was necessary to the defense.  Mr. Cataldo and Mr. McDaniel were active, experienced, and capable of representing Defendant's interests in this case—which, as noted above, did not involve complex or novel issues of intellectual property law.  Accordingly, Defendant may not recover the attorney's fees ($2,286.00) associated with the hours expended by Mr. Falkenstein.

With the exceptions for addressing the press, preparing a counterclaim, and Mr. Falkenstein's duplicative work, the number of hours submitted by defense counsel is reasonable in light of the length and subject matter of this case as well as the various pleadings filed. Defendant's request for compensation for the other time expended in this litigation will therefore be accepted.

### C

As a final matter, Defendant contends that it is entitled to recover $18,843.71 in costs associated with its defense of Plaintiff's claims.[12]   These purported costs include, *inter alia*, charges for copies, Westlaw and Lexis research, faxes, witness fees, mileage expenses, travel expenses, deposition fees, and expert fees.

Plaintiff, however, contends that Defendant is not entitled to recover all of these costs. Specifically, Plaintiff contends that Defendant should be limited to recovery of those costs taxable under 28 U.S.C. § 1920, which limits the types of costs taxable against the losing party. To support this contention, Plaintiff points to several decisions from the Eastern District of Michigan refusing to allow recovery under the Copyright Act of costs for legal research—a non-taxable cost under § 1920.  *See, e.g., Bell v. Prefix, Inc.*, 784 F. Supp. 2d 778, 792 (E.D. Mich. 2011); *Fharmacy Records v. Nassar*, 729 F. Supp. 2d 865 (E.D. Mich. 2010).

These cases do not, however, appear to comport with the Sixth Circuit's decision in *Coles v. Wonder*, 283 F.3d 798, 803 (6th Cir. 2002).  In *Coles*, the Sixth Circuit affirmed—without explanation—an award of taxable and non-taxable costs under the Copyright Act.  *Id.*  Although the Sixth Circuit has not provided a rationale for awarding non-taxable costs, the reasoning of the Ninth Circuit is persuasive:

> [W]e think that there can be no other import to the phrase "full costs" within [17 U.S.C.] § 505.  Construing § 505 as limiting the costs that may be awarded to any particular subset of taxable costs effectively reads the word "full" out of the statute. We must give every word in a statute meaning.  To do otherwise would be to violate the long standing principle of statute interpretation that statutes should not be construed to make surplusage of any provision.

---

[12] It is unclear whether this amount represents the total costs associated with the defense of each and every one of Plaintiff's claims, or just the amount related to the misappropriation defense. As described above, Defendant is entitled to costs associated with its entire defense of the misappropriation claim, but it may not be entitled to all costs associated with its defense of the copyright and CFAA claims. Accordingly, this section simply determines that 28 U.S.C. § 1920 is not a bar to the recovery of costs under the Copyright Act; it does not address the amount of costs Defendant is entitled to under the Copyright Act.

*Twentieth Century Fox Film Corp. v. Entertainment Distributing*, 429 F.3d 869, 885 (9th Cir. 2005) (citations and quotation marks omitted). Accordingly, because Congress permitted "recovery of full costs", Defendant is not constrained by whether the requested costs are taxable or non-taxable costs under 28 U.S.C. § 1920.

## VI

As described above, Defendant is entitled to costs and attorney's fees for the defense of each of Plaintiff's claims in this litigation. The only remaining question is: What amount of fees and costs are reasonable, and therefore recoverable. The Court will therefore direct each of the parties to provide supplemental briefing addressing various issues.

Dice will be directed to provide supplemental briefing regarding when it concluded that it had no evidence to support its copyright and CFAA claims. Defendant is entitled to costs and fees under the Copyright Act—the remaining question is at what point in the litigation Defendant became entitled to those fees and costs. Certainly Defendant was entitled to costs and fees associated with the defense of the claims at the close of discovery and for preparing the motion for summary judgment, but it may have even been earlier in the litigation. Accordingly, Plaintiff is directed to demonstrate at what point during discovery it knew or should have known that it had no evidence to support its copyright and CFAA claims.

Defendant will be directed to provide supplemental briefing regarding several questions related to its requested costs and fees, mainly concerning its use of block billing. First, as Defendant is entitled to all costs and fees associated with defending the trade secret misappropriation claim, it must provide an explanation of which costs and fees were associated with just the trade secret misappropriation claims. If Defendant can adequately demonstrate that

the costs and fees are associated with its defense to misappropriation, it will be entitled to those costs and fees.

Second, Defendant will need to provide more information regarding Mr. McDaniel's assertion that he cannot provide descriptions of about 107 hours of billed time due to attorney-client privilege concerns. Defendant will need to produce additional information, presumably in the form of a privilege log,[13] showing that it is entitled to fees for those 107 hours.

Finally, more information is needed regarding Defendant's block billing. As discussed above, certain work performed by defense counsel is not recoverable because it was unnecessary or duplicative. In addition, Defendant may not be entitled to all the costs and fees associated with its defense of the copyright and CFAA claims. However, because defense counsel used block billing, it is impossible to separate the recoverable hours from the nonrecoverable hours. Defendant will therefore be directed to explain how to separate the recoverable hours from the nonrecoverable hours, given Defendant's use of block billing.

Accordingly, it is **ORDERED** that Defendant's Renewed Motion for Attorney Fees and Costs (ECF No. 115) is **GRANTED IN PART AND DENIED IN PART**. Defendant is entitled to at least some amount of costs and fees pursuant to the Michigan Uniform Trade Secrets Act, 28 U.S.C. § 1927, and the Copyright Act. However, some expenses incurred by Defendant, such as Mr. Falkenstein's work and dealing with the media, are not reasonable expenses and are not recoverable.

---

[13] The privilege log should contain sufficient information regarding each redacted billed hour. Such information should include: (1) the date of the work; (2) the full name, job title, and capacity of the attorney; (3) a description of the subject matter of the billed hour with information sufficient to demonstrate the existence of the privilege; (4) whether the primary purpose of the work performed was to provide legal advice or services and whether any documents created were transmitted in confidence; (5) sufficient information to demonstrate that each element of the doctrine or privilege is satisfied; and (6) a statement that the privilege has not been subsequently waived.

It is further **ORDERED** that Plaintiff is **DIRECTED** to file supplemental briefing on or before **July 11, 2014**, regarding when it knew or should have known that it had no evidence to support its copyright and CFAA claims—given that the Court has already determined that it should have known, at the latest, by the close of discovery.  Defendant may file a response to Plaintiff's supplemental brief on or before **July 25, 2014.**

It is further **ORDERED** that Defendant is **DIRECTED** to file supplemental briefing on or before **July 11, 2014**, explaining how it suggests dividing the recoverable amounts from the nonrecoverable amounts given Defendant's use of block billing. The supplemental briefing should also provide greater detail regarding Mr. McDaniel's 107 hours of redacted work product. Plaintiff may file a response to Defendant's supplemental brief on or before **July 25, 2014**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 18, 2014

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 18, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

---